556 A.2d 1126

**The VILLAGE OF CROSS KEYS, INC. and
The Rouse Company**

**v.**

**The UNITED STATES GYPSUM COMPANY.**

**FRANK O. GEHRY & ASSOCIATES, INC.**

**v.**

**THE UNITED STATES GYPSUM COMPANY.**

**Nos. 36 and 37, Sept. Term, 1987.**

Court of Appeals of Maryland.

May 3, 1989.

Motion for Reconsideration Denied June 6, 1989,
for No. 37 only.

742

Paul V. Niemeyer (Lewis A. Noonberg, E. Fremont Magee, H. Mark Stichel and Piper & Marbury, Baltimore, and Richard R. Goldberg and Richard E. Galen, of counsel, Columbia, on the brief), for appellants in No. 36.

Michael J. Jack (Smith, Somerville & Case, on the brief), Baltimore, for appellant in No. 37.

Allan J. Malester (Gloria M. Belgrad, Jerrold A. Thrope and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, on the brief), Baltimore, for appellee in Nos. 36 and 37.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

The Council of Unit Owners of Harper House Condominium sued the Village of Cross Keys, Inc. (VCK) and the Rouse Company (Rouse), contending that VCK and Rouse, as developers of the Harper House building, were respon-

sible for damages resulting from defective exterior walls. VCK and Rouse, hereinafter referred to collectively as the developer,[1] in turn sued Frank O. Gehry & Associates, Inc., the design architect, for indemnity or contribution.[2] The developer and the architect each sued United States Gypsum Company (USG), claiming that they relied upon USG's design for the construction of the exterior walls, and that the design and certain representations concerning it were faulty. USG filed motions to dismiss, contending, among other things, that: it had not designed a proprietary exterior wall system; any representations it made concerning a generic system shown in its brochure were accurate; it had not contracted with anyone in connection with the construction of the Harper House building; its materials were not involved in the construction of the exterior walls; and, it owed no legal duty to the developer or to the architect. Judge Thomas E. Noel of the Circuit Court for Baltimore City treated USG's motions as motions for summary judgment and, after considering the voluminous depositions and exhibits that had been produced by extensive discovery, granted the motions. The trial judge then entered final judgment in favor of USG, expressly finding that there was no just reason for delay. Maryland Rule 2–602(b). The developer and the architect appealed, and we granted certiorari before consideration by the Court of Special Appeals.

This appeal presents interesting and difficult questions concerning potential liability for negligence. In this case, petitioners' claim that a tort duty must be imposed upon one who has erred generates the specter of "liability in an indeterminate amount for an indeterminate time to an inde-

---

**1.** Rouse contends that the only developer was VCK, a subsidiary of Rouse. We treat the two entities as one for purposes of this appeal.

**2.** The developer has also claimed indemnity or contribution from the builder, the structural engineer, subcontractors and others, but those claims are not involved here. Before this appeal was taken, the developer entered into a settlement with the Council of Unit Owners, and proceeds now in its own right and as assignee of all rights of the Council of Unit Owners.

terminate class," a liability that concerned Justice Cardozo in *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931), and continues to concern courts today. We are asked to consider the sometimes subtle difference between a cause of action for negligence in general and one for negligent misrepresentation, and whether the difference is material here. Additionally, we are asked to revisit the question of economic loss versus risk of physical harm, and the impact of each type of damage upon the question of how far a duty should extend. *See Council of Co–Owners v. Whiting–Turner*, 308 Md. 18, 517 A.2d 336 (1986). For a better understanding of the context in which these questions arise, we set forth a more detailed description of the underlying facts.

The building in question is a 15 story, 194 unit, luxury high-rise condominium. The developer began planning for construction in the late 1960's, and construction specifications were issued in March 1974. Shortly after completion of the building in 1976, water leaks were reported in various units throughout the building, and to date at least 50 units have shown evidence of intrusion of water from the outside. The developer attempted several corrective measures, but was not successful. The exterior wall system was examined by a number of experts, who predictably came to somewhat different conclusions concerning the cause of the problem. There is substantial evidence, however, to support the contention of the developer that the only adequate means of correcting the defective conditions that now exist involve the complete removal of the brick veneer, replacement or correction of the backup wall system as required, and installation of new brick. This work has begun, and according to the developer will cost 15–20 million dollars, in addition to the 3 million dollars already expended in the initial remedial measures.

The extensive record already developed in this case suggests there may be multiple causes of the exterior wall problem, including deficiencies in materials, workmanship, supervision, design, and specifications. Petitioners contend

that at least a substantial cause of the problem may be the design of the brick veneer, steel stud, curtain wall system used in the building—a design they say was developed, published and promoted by USG.

Curtain wall systems have been employed by the building industry for some time. A curtain wall is not a part of the structural skeleton of the building, as would be a weight bearing wall. It simply spans an upper and lower deck (or floor) of the building, enclosing that floor. A wall system consists of the exterior surface, such as brick or stucco, the interior surface, such as plaster, gypsum board, or paneling, and the core or "backup" to which each surface is in some manner connected. The curtain wall used in this building consists of an exterior surface of one wythe of laid-up 4 inch brick, and a backup of 2-1/2 inch steel studs fastened into steel runners at the top and bottom. Exterior sheathing is attached to the outside of the steel studs, and interior gypsum board (wallboard) is attached to the inside. The exterior wall of brick for each floor rests on an angle iron that is fastened to the concrete deck at the base of each floor, and is laid so that there is an air space of approximately 1 inch between the brick and the sheathing. To provide additional support for the brick wall, and apparently to transfer some part of the forces exerted on the brick wall to the backup structure, metal ties, called wall ties or brick ties, are placed at specified intervals. In this system, the ties used are corrugated metal strips, 1 inch wide and several inches long, with a galvanized coating. These ties are supposed to be securely screwed to the steel studs at the same time as or after the exterior sheathing is attached, and the free end of each tie is then to be inserted into a bed of mortar between the bricks as the wall is laid.

Brick veneer walls are not new. Until the mid–1960's, however, metal stud systems had not been used as a backup for brick veneer on high-rise buildings. Rather, concrete or other masonry walls were used as backup in such cases. For low-rise commercial and residential buildings, a wooden stud system often served as the backup for a brick veneer

wall. As metal stud systems proved increasingly popular for use in constructing interior non-load bearing walls, the manufacturers of those systems turned their attention to the potential of utilizing steel studs as a backup for exterior walls in high-rise buildings. USG's interest is documented by an internal report dated 14 July 1964, which stated:

At present the U.S. Gypsum Company does not participate in the curtain wall market to any appreciable extent. The development of "the curtain wall system" has been undertaken to allow the company to expand into this very large and potentially profitable area.

Six years later, another USG internal report evaluated the market in these terms:

The curtain wall market is huge. If we could make only a 1% penetration, this would result in gross sales of more than $15,000,000 now; $19,500,000 in 1975; and $22,500,-000 in 1980. (These are in constant 1968 dollars.)

Using their own architects and engineers, USG in the late 1960's or early 1970's developed and issued specifications for a brick veneer, steel stud, gypsum board curtain wall system. There is evidence that USG sales representatives reported difficulty in selling the system because architects were having trouble defining the system from the limited specifications given up to that time. As a result USG developed a more comprehensive 24–page publication known as System Folder SA–805, USG Curtain Wall Systems (hereinafter, the "805"). The first 805, issued in 1973, was later described by USG as providing "complete details and specifications for the USG Brick Veneer Curtain Wall System, including wind load limiting height tables."

The 805, which petitioners insist was the document relied upon by the architect in designing the curtain wall system for Harper House, contained several parts. In addition to the narrative portions which described and extolled the system in its several applications, there were photographs of buildings built with the system; detail drawings of the system in several different applications; technical data charts, including structural properties of the studs, fire

ratings, heat transfer characteristics, and height limitations correlated to wind load requirements and size and spacing of studs; and, proposed written specifications.

Although there is evidence that the developer had decided to use a steel stud backup system before USG's 805 was seen by the developer or architect, and there is evidence that brochures of other major steel stud and gypsum board manufacturers were obtained and considered before a decision was made, we find the evidence sufficient to support petitioners' contention that the Harper House plans and specifications issued on 29 March 1974, relied heavily upon the 805 for the curtain wall system. Section 3.07 of the Harper House specifications, entitled "exterior walls," provides: "install all of components in accordance with the drawings and the applicable portions of U.S. Gypsum Curtain Wall System Specification SA 805." However, with the exception of the joint tape, joint compound, and corner beading to be used in the installation of the interior dry wall, the Harper House specifications did not require the use of USG products.

Petitioners offered evidence that the 805 design was defective in several important respects, and that the 805 contained misrepresentations. Specifically, they contend that the design: permitted excessive infiltration of water; did not make adequate provision for the handling of infiltrating water; and did not provide a wall that would withstand the wind loads represented. Petitioners contend that the representations made in the 1973 and 1974 editions of the 805 concerning air and water infiltration were false. The 1973 representation was that "the systems meet air and water infiltration standards set by FHA and NAAMN." The 1974 representation was the same, with the addition of the words "and have been successfully tested at 90 mph wind pressure."

Petitioners claim as a result of deficiencies in the system, excess water has infiltrated the curtain wall of the Harper House, causing not only leaks into the interior of the units, but also rust and corrosion of the brick ties, the steel studs,

the metal runners into which the studs fit, and the bolts that are supposed to anchor the runners to the concrete deck. These conditions, they claim, have substantially undermined the structural integrity of the backup system, further diminishing its ability to provide the required stability for the brick wall.

The evidence produced by pretrial discovery shows that there is a dispute among the experts concerning the ability of the 805 system to actually carry the wind load specified in the 805 tables. Petitioners point out, however, that they have produced evidence which would permit a trier of fact to find that the 805 system built to USG's specifications with USG materials will not perform adequately. Specifically, they say, the inadequacy of the brick anchors and the lack of inherent structural integrity of the steel stud system as specified would permit the brick veneer wall to flex four times as much as it should, thus causing severe cracking in the brick veneer and mortar joints, and over stressing the backup system at critical points.

These factors, petitioners claim, have had a compounding effect on the wall at Harper House, allowing more and more water infiltration, and thus more rusting and loss of structural integrity to the point where anticipated wind loading could suck entire sections of the brick veneer wall off the face of the building.

USG has vigorously defended these claims, insisting that the 805 system was properly designed, and will perform to specifications when properly constructed. It points out that specification 1.2 of the 805, entitled "Qualifications," provides that "all materials, unless otherwise indicated, shall be manufactured by United States Gypsum Company, and shall be installed in accordance with its current printed directions," but that no USG materials were used in the structural portions of the Harper House curtain wall system. Additionally, USG says that the Harper House design and specifications contain significant deviations from the 805 system, and that various inspections have discovered

material and construction deficiencies that are sufficiently serious to have caused the current problems.

Among the more significant of the design deviations to which USG points, and which the record undeniably shows exist, are as follows. The 805 detail drawings call for reinforcement of steel runners at the tops and bottoms of windows more than 4 feet wide by "nesting" two steel studs together, or reinforcing or nesting the runners at those points. The Harper House plans did not specify this requirement, nor were the steel studs actually used in Harper House construction designed to permit nesting.[3] More than 300 windows in Harper House were at least 8 feet wide, and apparently the backup system actually used was not reinforced in any way at these windows.[4] The 805 specifications required brick ties every 24 inches, vertically and horizontally. The Harper House drawings reflected this, but the specifications left the number and location of the ties to the discretion of the mason. The 805 required the steel runners into which the studs fit to be securely fastened to the concrete slabs at 24 inch intervals. The Harper House specifications, although generally specifying that all components should be installed in accordance with the applicable portions of the 805, required fasteners for the steel runners only every 42 inches. The 805 required the use of 3–5/8 inch studs when the curtain wall exceeded 8 feet 6 inches in height, but the Harper House design

---

**3.** The USG steel studs were specifically designed with slightly different size flanges so that one could be slipped inside another, thus creating a single, stronger beam from the nested components.

**4.** The evidence also shows that the structural engineer apparently contacted a USG representative concerning modifications that might be necessary in the 805 system for window openings having a width of more than 8 feet. The engineer was apparently told to nest the vertical studs and horizontal runners at all four sides of such window openings to add a third bracing stud or runner along the bottom of the window opening, and to nest all vertical studs beneath the window opening. The structural engineer apparently gave this information to the design architect, but it was not incorporated into the plans or specifications for the Harper House nor, it would appear, into the construction.

specified 2-1/2 inch studs throughout, even though the span at the fourteenth floor was 9 feet 3/4 inches.

The alleged deficiencies in construction were also numerous, including: use of the wrong bricks; improper mortar; inadequate mortar to fill the head joints; use of the wrong brick ties, (galvanized before fabrication); brick ties completely missing, or too few in number, or connected improperly or not at all; bed mortar protruding into the air space; mortar allowed to accumulate at the base of the air space; inadequate weep holes to allow water to leave the interior of the wall; inadequate or nonexistent installation of flashing to direct interior water to weep holes; failure to use foil backed sheathing; inadequate fastening of exterior sheathing to studs; insufficient and inadequate fastening of steel runners to concrete decks; and, inadequate or non-existent fastening of steel studs to steel runners at top and bottom.

Although we have set forth the alleged construction deficiencies to give a more complete picture of the controversy, we point out that if USG has potential liability to the petitioners, and if it is guilty of a negligent design or misrepresentation that is a legally cognizable cause of the current defective condition, the fact that the negligence of others may have contributed to the loss would not ordinarily excuse USG. *See Cincinnati Riverfront Coliseum v. McNulty Co.*, 28 Ohio St.3d 333, 504 N.E.2d 415, 419 (1986).

■ We return, then, to the pressing question of whether USG may be liable under the circumstances of this case. Because petitioners' claims sound in negligence, we look first to whether USG owed a tort duty to these petitioners. As this Court said in *W.Va. Central R. Co. v. Fuller*, 96 Md. 652, 666, 54 A. 669 (1903):

[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be

sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.

We discussed the concept of duty at some length in *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986). Quoting from *Prosser & Keeton on The Law of Torts* § 53, at 357 (5th ed.1984), we said that a tort duty "is ... an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection," and that a tort duty is not necessarily coextensive with a moral duty. *Jacques, supra,* 307 Md. at 533–34, 515 A.2d 756. We also discussed the question of duty in *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986), and there agreed with the observation of the Supreme Court of California that among the variables to be considered in determining whether a tort duty should be recognized are:

> [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976).

In *Jacques,* and more recently in *Council of Co–Owners v. Whiting–Turner, supra,* we discussed the relationship of the parties and the nature of the actual or foreseeable harm in a given case as additional factors to be considered in determination of the existence of a duty. In *Jacques,* a

case involving only economic loss, we said at 307 Md. 534–35, 515 A.2d 756:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability. (footnote omitted.)

In *Whiting–Turner*, which involved a claim for the cost of correcting a construction defect which presented a clear danger of death or personal injury, we said at 308 Md. 32–35, 517 A.2d 336:

> In following the modern trend, we hold that privity is not an absolute prerequisite to the existence of a tort duty. The duty of the architects and the builders in this case, to use due care in the design, inspection, and construction of this condominium extended to those persons foreseeably subjected to the risk of personal injury created, as here, by a latent and unreasonably dangerous condition resulting from their negligence.
>
> \* \* \* \* \* \*
>
> We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition. (footnote omitted.)

For other discussions of the extent to which there should be liability for negligence or negligent misrepresentation when

economic loss alone has resulted, *see* Archer, *Architects' Liability to Third Party Contractors for Economic Loss Resulting from Faulty Plans and Specifications*, 27 Ariz. L.Rev. 139 (1985); Craig, *Negligent Misstatements, Negligent Acts and Economic Loss*, 92 *Law Q. Rev.* 213 (1976); James, *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vand. L.Rev. 43 (1972); Note, *A Framework for Determining Liability for Negligently Caused Economic Losses*, 1986 B.Y.U.L. Rev. 177.

Although *Whiting–Turner* concerned negligent conduct, similar principles apply when negligent misrepresentation is involved. *See Restatement (Second) of Torts* § 311 comment a (1965), noting that the rule pertaining to negligent misrepresentation involving the risk of physical harm represents a somewhat broader liability than the rule relating to liability for pecuniary loss resulting from negligent misrepresentation.

■ Whether we should treat this claim as one of negligent misrepresentation or as one of negligent conduct is a matter of disagreement between the parties. Federal courts have been required to wrestle with the sometimes difficult problem of distinguishing one from the other because the federal Tort Claims Act permits claims for negligence but bars claims "arising out of—misrepresentation." 28 U.S.C. § 2680(h). In *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), the purchasers of a home who had suffered loss when they relied on a negligently excessive FHA appraisal sought to avoid the strictures of the misrepresentation exclusion by contending that the appraiser had negligently inspected and appraised the property when he failed to notice cracks in the ceilings and walls of the house. The Supreme Court held the claim to be one of negligent misrepresentation, notwithstanding the presence of underlying negligent conduct in making the inspection and in preparing the appraisal.

To say, as the Fourth Circuit did, that a claim arises out of "negligence," rather than "misrepresentation," when

the loss suffered by the injured party is caused by the breach of a ... duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of "negligent misrepresentation,".....

*Neustadt*, 366 U.S. at 706, 81 S.Ct. at 1300. It is true, of course, that where the plaintiff would have a cause of action based on the underlying negligence independent of the misrepresentation, that cause of action survives and is not merged into the later misrepresentation. *Block v. Neal*, 460 U.S. 289, 296–98, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983).

The gravamen of the action here is negligent misrepresentation. It is the alleged misinformation that USG published in the 805 of which petitioners complain. Even if petitioners were able to demonstrate that USG was guilty of underlying acts of negligence in their computations, testing, failure to test, or the like, that would be negligence in a vacuum, unconnected to these petitioners in the absence of the publication of the 805.

 The history of the tort of negligent misrepresentation in Maryland was set forth in *Weisman v. Connors*, 312 Md. 428, 443–48, 540 A.2d 783 (1988), and *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534 (1982). The principal elements of the tort were set forth in *Weisman* at 312 Md. 444, 540 A.2d 783:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

We have made it clear that the tort will lie for the recovery of pecuniary losses, as well as for physical harm. *Martens Chevrolet, supra,* 292 Md. at 336, 439 A.2d 534; *Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963).

Sections 552 and 311 of the *Restatement (Second) of Torts* (1965) dealing with negligent misrepresentation are reproduced in the margin.[5] It may be observed that liability for negligent misrepresentation is more restricted than that for fraudulent misrepresentation, and liability for neg-

---

**5.** § 552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

\* \* \* \* \* \*

§ 311. Negligent Misrepresentation Involving Risk of Physical Harm

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

(a) to the other, or

(b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of failure to exercise reasonable care

(a) in ascertaining the accuracy of the information, or

(b) in the manner in which it is communicated.

ligent misrepresentation resulting only in pecuniary loss is more restricted than that for negligent misrepresentation resulting in physical harm. It should also be observed that in each of these sections, as well as in the elements of the general tort we set forth in *Weisman, supra,* the concept of duty is clearly present, as is the requirement that there be "justifiable" or "reasonable" reliance by the parties suffering the loss. We view the elements of duty and reliance as dispositive of the claims against USG in this case.

The close interrelationship of the concepts of duty and reliance is evident in this statement of the Court of Appeals of New York in *International Products Co. v. Erie R. Co.,* 244 N.Y. 331, 155 N.E. 662, 664 (1927), speaking of a claim for negligent misrepresentation:

Liability in such cases arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care.

In the case before us, USG contends that even if the information it published in the 805 is erroneous in material respects, USG cannot be liable for its gratuitous publication to persons with whom USG had no dealings, but who were only a part of the "general universe" or "vast, faceless crowd of *Sweet's Catalog* users." [6] Nowhere, USG says, is

6. The 805 was published in *Sweet's Catalog,* a multi-volume work published by McGraw–Hill of New York, and sold to architects and other interested persons throughout the United States. Manufacturers pay to have their brochures or folders included in the catalog, and the subscribers may purchase one or more of the volumes, depending on their interest in the subject matter.

there evidence of the "intimate nexus" of which we spoke in *Jacques*, or of a limitation of the group of those who might be harmed sufficient to avoid the "specter of unlimited liability, with claims devastating in number and amount crushing the defendant because of momentary lapse from proper care," of which Prosser wrote.[7]

We harbor grave doubts concerning the vitality of that argument advanced by USG. It is true that USG did not directly "sell" this system or any component parts of it to the developer or to the architect. It did, however, develop a system under circumstances from which the trier of fact could find a specific intent that architects and perhaps engineers, builders, or developers would adopt it. The record discloses that the 805 and similar manufacturers' publications receive wide distribution in the trade by inclusion in *Sweet's Catalog*. Additionally, the 805 was directly available from USG or any of its sales staff. Although USG did not design the system for a fee from a particular client, or attempt to "sell" it for direct compensation, it is safe to say it did not develop and publish these detailed drawings, specifications, and technical data tables for some altruistic motive. As one of a relatively few major manufacturers of the component parts of the system, it reasonably expected that acceptance and use of the system generally would translate into significant increased sales of its merchandise. It may reasonably be said, then, that the development and distribution of the 805 was for the purpose of earning a profit, albeit somewhat indirectly, and therefore publication was effected for USG's pecuniary interest.

Although the group of persons who may be expected to rely upon information of this kind may be large, they are identifiable, particularly if the group is limited to architects and structural engineers. That their names cannot be known in advance is of no consequence. *Henley v. Prince George's County*, 305 Md. 320, 334–36, 503 A.2d 1333 (1986). A trier of fact could find that the architects and

---

7. W. Prosser, *The Law of Torts* § 107 (4th ed. 1971).

engineers are the very persons whom USG intended to act on the information supplied. We think it clear that in some circumstances it is the practice of the industry that architects and engineers depend upon technical information supplied by manufacturers. We doubt that the industry standard requires that each architect and engineer "reinvent the wheel" for each project. Projected liability for error may be great when technical information is published under these circumstances, but apparently the potential for profits may also be great, and a decision of whether to publish in this fashion, and how much care to use in research, testing, conformation, proof reading, and the like may simply be business decisions. We need not, however, and do not decide this issue, leaving to another day the question of whether a manufacturer may, under certain circumstances, be responsible for negligent publication of information in this manner. Rather, we rest our decision on the more narrow grounds made possible by the specific facts of this case.

The information published by USG in the 805 clearly applied to USG products. The specifications set forth in the 805 called for the use of USG products "unless otherwise indicated." The principal structural components of the backup system shown in the 805, including the metal studs, metal runners, screws, and gypsum boards, were specified to be USG products. The plans called for the "nesting" or "boxing" of studs and runners at critical places and the USG studs and runners, unlike others and unlike those actually used in this construction, were specially designed and fabricated so that they could be so joined. The technical data in the 805 either expressly or implicitly related to the system as built with USG products. Tables giving structural properties of the studs were entitled "structural properties—20 GA. USG metal studs." Wind loading tables, which provided information concerning the size of the stud to be used, the spacing of studs, the spacing for attachment of runners, and limitation of height of the wall, all depending upon the wind pressure which had to be

accommodated, were entitled "limiting height, USG metal stud and runner fastener spacing." Heat transfer characteristics were given for "USG metal stud system."

In the construction of the Harper House, USG products were neither specified nor used in the structural portions of the curtain wall system. The trial judge found this to be a fact not in dispute, and we concur. The USG joint tape, joint compound, and corner beading that may have been used on the interior walls simply do not play a part in the structural integrity of the curtain wall. Under these circumstances, we hold that petitioners' claimed reliance upon the information contained in the 805 was not reasonable within the meaning of the "reasonable reliance" requirement of the tort of negligent misrepresentation. Assuming, arguendo, that a claim might lie against USG if all, or substantially all, of the critical USG components had been used, we find that the trial judge was correct in deciding as a matter of law that the claim could not lie under the facts not in dispute in this case.

The same result could be expressed as well in terms of the absence of a duty, for we believe that as a matter of policy it would be inappropriate to impose a tort duty upon USG under these circumstances. Assuming the possible existence of a tort duty upon USG as a result of the publication of the 805, that duty should extend to those who seek to challenge a system they have used, and not to those who do not. While USG might reasonably be called upon to defend the system it espoused, that is not the case here, nor is it sufficiently close to that case to make it a jury issue.

The developer has also presented, without much force, an alternative argument that publication of the 805 amounted to a promise which the developer and architect accepted when it used the 805, so that the developer now has a claim for breach of contract or warranty. We fail to perceive a glimmer of merit in the argument.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY THE

PETITIONERS, ONE–HALF BY THE DEVELOPER AND
ONE–HALF BY THE ARCHITECT.