73 A.3d 343

**PREMIUM OF AMERICA, LLC**

v.

**William SANCHEZ, et al.**

**No. 43, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Aug. 29, 2013.

92

94

David G. Sommer (Paul S. Caiola, Gallagher, Evelius & Jones LLP, on the brief) Baltimore, MD, for appellant.

Michelle R. Mitchell (D. Lee Rutland, Robert J. Farley, Wharton, Levin Ehrmantraut & Klein PA, on the brief) Annapolis, MD, for appellee.

Panel: KEHOE, BERGER, and RAYMOND G. THIEME, JR. (Retired, Specially Assigned) JJ.

Opinion by KEHOE, J.

In this case, we address a familiar issue—the scope of a party's liability for financial harm caused by negligent misrepresentations—in an unusual context: the marketing of viatical settlements. As we will explain in greater detail, a viatical settlement is a transaction in which an investor purchases the beneficial rights in an existing life insurance policy on a terminally ill person in return for the policy proceeds upon the insured's death. The investor also assumes the obligation of paying the policy premiums. Whether to purchase a viatical policy in the first place and, if so, how much to pay for it, depends in no small part upon the life expectancy of the insured. Some of those who invested in viatical settlement contracts in the 1990's did so with the expectation that medical science would continue to be ineffective in treating HIV/AIDS and related maladies. They were wrong and their investments became worthless.

Premium of America, LLC, ("Premium"), whose members are such investors, filed claims of negligence, negligent misrepresentation, and gross negligence in the Circuit Court for Baltimore County against appellee, William C. Sanchez, M.D.,[1] a District of Columbia physician who provided life expectancy estimates for persons suffering from HIV/AIDS in this time period. Premium asserted that Sanchez significantly underestimated the life expectancies of these persons because he did not take into account advances in HIV/AIDS treatment and that his failure to do so was the result of his negligence or gross negligence. Sanchez filed a motion for summary judgment arguing, among other grounds, that the claims failed as a matter of law because there was no nexus, privity, or any other relationship between him and any investor that established a duty on his part to them. After holding a hearing,

---

**1.** Premium also filed this suit against William C. Sanchez, M.D., P.C. We will refer to appellees in the singular, as "Sanchez."

the circuit court granted the motion because it concluded that Sanchez did not owe a duty to Premium's members and therefore was not liable to them for any errors in his evaluations.

Premium filed a motion to alter or amend the judgment or, in the alternative, a motion for leave to file an amended complaint to add a breach of contract claim against Sanchez. The circuit court denied both motions. Premium appeals and presents three questions, which we have reworded and combined as follows: [2]

I. Did the circuit court err in granting Sanchez's motion for summary judgment on the basis that Sanchez did not owe a duty to those who invested in the viatical life insurance policies?

II. Did the circuit court abuse its discretion in refusing to grant Premium's motion for leave to file an amended complaint?

We will affirm the circuit court's judgment.

## Background

"In reviewing the grant of summary judgment, we construe the facts properly before the court and any reasonable inferences that may be drawn from them, in the light most

---

**2.** Premium presented its questions as follows:

I. Did the Circuit Court Err in Holding that Sanchez Did Not Owe to the Purchasers of Life Insurance Policies a Duty to Provide Reasonable Life Expectancy Evaluations When Sanchez and the Purchasers Were in Contractual Privity Pursuant to the Undisclosed Principal Doctrine?

II. Under Section 552 of the Restatement (Second) of Torts, Did the Circuit Court Err in Holding that Sanchez Did not Owe to the Purchasers of Life Insurance Policies a Duty to Provide Reasonable Life Expectancy Evaluations When Sanchez Knew That They Were Providing the Evaluations to Aid in the Purchase of the Policies?

III. Did the Circuit Court Abuse Its Discretion in Refusing to Grant POA Leave to File an Amended Complaint Adding a Count for Breach of Contract When the Pending Complaint Already Stated Facts Sufficient to Allege a Cause of Action for Breach of Contract?

favorable to the non-moving party...." *Benway v. Md. Port Admin.*, 191 Md.App. 22, 45–46, 989 A.2d 1239 (2010) (citing *Laing v. Volkswagen of Am.*, 180 Md.App. 136, 152–53, 949 A.2d 26 (2008)).

We think it useful to begin with some terminology and background information. In *Life Partners, Inc. v. Morrison,* 484 F.3d 284, 287 (4th Cir.2007), Judge Paul V. Niemeyer explained that "[a] 'viaticum' in ancient Rome was a purse containing money and provisions for a journey. A viatical settlement, by which a dying person is able to acquire provisions for the remainder of his life's journey by selling his life insurance policy, is thus thought to provide a viaticum. In the language of the industry, the insured is the 'viator,' who sells his policy at a discount to a 'provider' of the viaticum." Judge Niemeyer continued:

> The viatical settlements industry was born in the 1980s in response to the AIDS crisis. In the early years, AIDS was a rapidly fatal disease, and its victims usually died within months of diagnosis. Many AIDS sufferers were in great need of cash to pay for their care after they had become debilitated. Their life insurance policies were not only expensive to maintain but could, upon liquidation, provide some of the desperately needed cash. Moreover, investors were willing to purchase the life insurance policies of AIDS sufferers. Inasmuch as AIDS sufferers had predictably short life expectancies, their policies were reliable investments.

*Id.*

### A. The Purchase of Viatical Policies on Behalf of Premium's Members

This case arises out of the actions of several affiliated companies, including Beneficial Assurance, Ltd. and Premium Escrow Services, Inc. (collectively, "Beneficial"). Beneficial was an agent for investors who were seeking to purchase viatical policies, that is, to become "providers." While the specifics varied from case to case, Beneficial sought out potential investors and identified each investor's financial goals and the amounts he or she was willing to invest. Beneficial

entered into written agreements with each investor by which the investor authorized Beneficial to purchase viatical policies on his or her behalf. These contracts included a disclaimer as to the reliability of estimates of viators' life expectancies.[3] The investor placed funds into an escrow account administered by Beneficial to cover the purchase price of the policy and the life insurance premiums that would come due between the date of purchase and the date of the insured's death. The funds reserved for premium payments were usually calculated based on the viator's life expectancy—as determined by a third-party physician—plus one year.

Viatical policies were often sold at auction and, as part of the auction process, Beneficial obtained the viator's medical records. Beneficial submitted the medical records to a third-party physician who would review the information and provide a life expectancy estimation for the viator. Based in part upon the life expectancy evaluation, Beneficial would match a viatical policy to one or more investors and would bid on it. If

---

**3.** Specifically, the agreement stated:

Actual lifespan may exceed estimated life expectancy.... Estimating life expectancy, even for the terminally ill, is an inherently subjective process. The actual lifespan of the viator may be affected by numerous factors, including medical advances. Accordingly, the viator's actual lifespan may be shorter or longer than the estimated life expectancy. In addition, an actual lifespan that exceeds the estimated life expectancy may trigger premium payment obligations on the part of the purchaser.

The estimated life expectancy may be based on a misdiagnosis. Although [Beneficial] believes that the independent physicians with whom [Beneficial] has contracted to review the medical records of the viator are well-qualified, a risk exists of a misdiagnosis of the viator's condition. The physicians retained by [Beneficial] to estimate life expectancies are independent contractors and [Beneficial] is not responsible for any errors made by such physicians in determining estimated life expectancies.

 \* \* \*

If the viator lives longer than the period for which premiums are prepaid, the purchaser may be required to pay the premiums in order to keep the policy in force. The failure to continue to pay premiums could cause the policy to lapse, in which case the purchaser would not receive any death benefit and would lose his or her entire purchase.

Beneficial was successful, at closing, the viator assigned the beneficial interest in the policy to an escrow agent, which, while purportedly independent, was actually under Beneficial's control. The escrow agent held the policy for the investor and disbursed funds as needed to pay policy premiums.

After closing, Beneficial sent a package of closing documents to the purchasers whose funds were used in the settlement. The package usually included information about the insurance policy, the financial rating of the insurer, an assignment, documentation as to the transfer of the beneficial interest in the policy to the escrow agent, and a copy of the report from the physician who had reviewed the viator's medical records and provided an estimate of the viator's life expectancy to Beneficial.[4]

### B. The Collapse of Beneficial and the Formation of Premium

Almost from its inception, the viatical settlement industry was permeated with fraud, bad faith and sharp practice. The primary victims were viators, who were gravely ill and typically in desperate need of money. *See Life Partners,* 484 F.3d at 287–88. As a result, many states enacted legislation providing some measure of protection to viators. *Id.*[5] The degree to which these regulations affected Beneficial's operation is unclear but there is no question that some of Beneficial's business practices regarding its relations with investors were improper.[6] Moreover, because of advances in HIV/AIDS

---

**4.** Sanchez's reports were recorded on forms prepared by Beneficial. The forms contained the following disclaimer:

> Please Note: A Life Expectancy cannot be precisely determined for any specific patient, but rather is the average life expectancy of a large group of patients with similar clinical and individual profiles. No one can guarantee or warrant the accuracy of any patient's precise life expectancy.

**5.** Maryland has done so. *See* Md.Code Ann., Ins. § 8–601 *et seq.* (1995, 2011 Repl.Vol.).

**6.** Although the specifics of Beneficial's misconduct are beyond the scope of this opinion, they allegedly included conversion of escrowed

treatments, many viators were outliving the life expectancy assumptions used by Beneficial to value viatical policies. Because investors only set aside enough money in escrow to cover premium payments for the life expectancy of the viator plus one year, Beneficial did not have sufficient funds in escrow to continue to pay the insurance policy until the viator's death. In such cases, the premium payments went unpaid and the viatical policies lapsed.

For these reasons, Beneficial went into bankruptcy in 2002. As part of the bankruptcy proceedings, the bankruptcy court confirmed a reorganization plan under which Premium was established as a limited liability company. The members of Premium are the investors who purchased viatical policies through Beneficial. The members assigned their interests in the policies to Premium as well as any claims that a member might have against any third party, such as Sanchez, retained by Beneficial in connection with the marketing, sale, and administration of the viatical policies.

### C. Dr. Sanchez

A board-certified pediatrician, Sanchez opened a family medicine practice in Washington, D.C., after his discharge from the Army in 1977. As the AIDS epidemic took hold in the 1980's, Sanchez provided medical care to a number of patients suffering from the disease. He co-authored four articles during that decade regarding HIV/AIDS which were published in respected medical journals such as The Lancet and The New England Journal of Medicine. Additionally, he participated in ten clinical studies of experimental AIDS medications in the 1980's and 1990's.

Initially, Sanchez provided life expectancy assessments for his own HIV/AIDS patients as they sought to sell their life insurance policies to providers. This brought him to Benefi-

---

funds by one or more of Beneficial's principals as well as misleading and false representations to its investors. *See Lubin v. Beneficial Assurance, Ltd.,* Circuit Court for Baltimore City, Case No. 24–C–02–006515, 2006 WL 5781983 (2006).

cial's attention and, eventually, Beneficial requested Sanchez to provide it with life expectancy evaluations for non-patients. Between 1996 and 1999, Sanchez provided 154 such assessments to Beneficial, which paid him $200 for each life expectancy evaluation. Premium contends that Beneficial relied on Sanchez's life expectancy projections in deciding whether, and at what price, to purchase viatical policies on behalf of its investors. Premium maintains that, if Sanchez had refused to provide a life expectancy projection or had provided a projection of greater than five years for a particular viator, Beneficial would not have purchased that viator's policy. Premium asserts that Sanchez significantly underestimated the life expectancies of many of the viators.[7]

Had the case proceeded to trial, Premium would have presented expert testimony that, because of by then widely-publicized advances in the treatment of HIV/AIDS, Sanchez should have realized that "the life expectancy of HIV-infected patients could not [have been] accurately projected" and that he should have stopped making them. The expert was prepared to testify that Sanchez was negligent in continuing to make the evaluations. Additionally, Premium would have presented other expert testimony to the effect that Sanchez's failure to make accurate life expectancy evaluations resulted in between $7 million and $9 million in damages to Premium's members.

For his part, Sanchez testified in his deposition that, while he knew that his life expectancy projections were being used for the purpose of purchasing life insurance policies by Beneficial, it never informed him that, in fact, it was acting as an agent for individual investors. Moreover, he maintained that he was not aware that Beneficial had engaged him on behalf of others. Beneficial presented no evidence to contradict this testimony. The record is undisputed that Sanchez's evaluations were made for Beneficial and Beneficial, not the inves-

---

7. Premium asserts that, as of the date that suit was filed (February 6, 2007), "[o]n average, the viators assessed by Sanchez had outlived their life expectancies to that date by 58 months—nearly 5 years."

tors, selected the specific viatical policies for each investor. Finally, individual investors became aware of Sanchez's evaluations only after Beneficial had purchased the viatical policies on their behalf.

## D. Proceedings in the Circuit Court

On February 6, 2007, Premium filed an action against Sanchez in the Circuit Court for Baltimore County alleging claims of negligence, negligent misrepresentation, and gross negligence. In its complaint, Premium alleged that Sanchez negligently provided inaccurate life expectancy evaluations to Premium's members (those who invested in viatical policies). Sanchez filed an answer denying or, in the alternative, defending against these accusations.

After the close of discovery, Sanchez filed a motion to dismiss or, in the alternative, a motion for summary judgment. Among other contentions, Sanchez asserted that the negligence claims failed as a matter of law because the undisputed facts showed that he owed no duty—of the sort that would give rise to liability for negligence in a case such as this—to the individuals for whom Beneficial purchased viatical policies.

Premium filed an opposition to Sanchez's motion for summary judgment. Of relevance to the present appeal, Premium argued that Sanchez owed the investors a duty to provide accurate life expectancies, that Sanchez breached that duty by offering life expectancy projections at a time when it was unreasonable to do so, and that the investors were harmed when the viators outlived Sanchez's projections by many years, rendering the investors' investments all but worthless. According to Premium, the facts of the case demonstrated that there was an "intimate nexus" between Sanchez and the investors, which was all that was necessary to prove that Sanchez owed a duty to the investors. Premium set forth two bases on which, it alleged, the circuit court could find that there was such an "intimate nexus" between the parties.

Premium first contended that to prove the presence of an "intimate nexus," it need only prove that there was contractual

privity between the parties. Premium maintained that Sanchez had contractual privity with the investors by virtue of the investors' agency relationship with Beneficial. Premium explains that, because of this agency relationship, Sanchez is as liable to the investors as if the investors themselves had made the contract with him, regardless of whether he was aware that Beneficial was acting as an agent on their behalf.

In the alternative, Premium argued that Sanchez's tort duty to its members was established under Section 552 of the Restatement (Second) of Torts because the investors were the limited group of persons for whose benefit and guidance Sanchez intended to supply the life expectancy evaluations.

After a hearing, the circuit court granted the motion for summary judgment in an opinion rendered from the bench. In addressing Premium's first claim—that it had established "intimate nexus" via contractual privity—the circuit court first expressed doubt that merely establishing any type of contractual privity automatically, as a matter of law, established an "intimate nexus." Even if any contractual privity could establish an "intimate nexus," the court continued, no such contractual privity existed between Premium and Sanchez. As the court observed, "at the point Sanchez is asked to write a report, Beneficial doesn't even know what policies it may buy and it doesn't know which investors' money it will use to purchase that policy." Furthermore, the court noted, in addition to the fact that Sanchez was unaware of the investors, the investors, in turn, were unaware of Sanchez because, while they received a summary of Sanchez's report after the policy was purchased, they did not receive Sanchez's actual report before the time of purchase. Accordingly, the circuit court concluded, Premium had not proven the existence of contractual privity between the parties.

The circuit court next addressed Premium's claim that it had established the presence of a tort duty through § 552 of the Restatement (Second) of Torts. The circuit court explained that, to establish a duty under § 552, Premium had to demonstrate that Sanchez had intended for his information to

be supplied to the investors or had known that Beneficial intended to supply his information to investors. The court concluded that the undisputed facts showed that Sanchez had not known what use Beneficial intended to make of the evaluations he supplied to it and had not known that his evaluations would be supplied by Beneficial to any other person. Therefore, § 552 did not establish a duty on Sanchez's part to the investors.

Premium filed a motion to alter or amend this judgment or, in the alternative, for leave to file an amended complaint to assert a breach of contract claim against Sanchez. In furtherance of its motion to alter or amend, Premium reiterated its previous contentions as to privity and Restatement (Second) of Torts § 552.

In the alternative, Premium argued, if the court found that privity existed but that there was no intimate nexus between the parties, the circuit court should grant Premium leave to amend its complaint to add a breach of contract claim. Premium contended that because its original complaint "already contains allegations establishing the existence of a contract and a breach of contract by [Sanchez], the First Amended Complaint simply adds 'Count 3,' reciting as a formality the elements of a breach of contract as they apply to [Premium's] allegations, and demands a judgment for damages for Defendants' breach."

The circuit court denied Premium's motion in a written memorandum and order, which elaborated upon its bench opinion. As to Premium's request that the circuit alter or amend the judgment, the circuit court stated that, to impose a tort duty, a contractual relationship alone does not establish an intimate nexus. Instead, the contractual relationship must also be accompanied by reliance, a risk of loss, and knowledge, by the defendant, of both the reliance and the risk. Here, however, "the facts are undisputed that [Sanchez] had no knowledge of the investors or the class of persons who have assigned their rights to [Premium], or the purpose for which [Sanchez's] report would be used by Beneficial." In fact,

Sanchez "had no knowledge that Beneficial was acting for investors or that Beneficial intended to use [Sanchez's] evaluations for the benefit of investors." Most importantly, "there was no evidence presented that [Sanchez] knew of Beneficial's reliance for the purpose of investing other people's money in the life insurance polices, and no evidence that [Sanchez] knew the risk of loss that is claimed by [Premium] in this case." Furthermore, there "was no contract between [Sanchez] and the eventual investors that subsequently assigned their interests to [Premium]."

As to Premium's argument that the "intimate nexus" requirement was satisfied by § 552 of the Restatement (Second) of Torts, the circuit court determined that Sanchez is not liable to Premium because Sanchez:

> had no knowledge of the class of persons who constitute the investors and who have assigned their interests to [Premium], and [Sanchez] did not intend to supply his reports to the class that [Premium] represents, and [Sanchez] had no knowledge of [Premium's] reliance on the evaluations for the purpose of selling interests in the life insurance policies.

The circuit court stated that, even if the Restatement (Second) of Agency established "contractual privity" between a third party and an undisclosed principal, as Premium alleged, "under the facts of this case it is not sufficient to establish an intimate nexus between" Premium and Sanchez under Maryland law. "The Plaintiff's theory would greatly increase [Sanchez's] potential liability to a class of persons unknown to [Sanchez] and for a risk unknown to [Sanchez]."

With regard to Premium's request for leave to file an amended complaint, the circuit court noted that Sanchez provided the evaluations at issue between 1996 and 1999. The circuit court noted that, at the time it was considering this motion, February, 2011, six years had elapsed from the time that the case had first been filed as an adversary claim in the Bankruptcy Court, and almost four years had elapsed since the case was filed in the circuit court. The court denied the

request for leave to file an amended complaint on the grounds that the action was barred by the statute of limitations.

## ANALYSIS

### I. Summary Judgment

Premium presents two primary arguments as to why the circuit court erred in concluding that Sanchez did not owe a tort duty to Beneficial's investors. First, it contends that Sanchez was in privity of contract with the investors because Beneficial was acting as an agent for undisclosed principals, namely the investors, when it asked Sanchez to provide life expectancy evaluations for would-be viators. Because the parties were in privity, continues Premium, Sanchez owed a duty as a matter of law to the investors.[8]

Second, Premium argues that the Restatement (Second) Torts § 552 imposes a tort duty on Sanchez:

> Maryland courts have adopted Section 552 as one equivalent of contractual privity and thus another means of satisfying the intimate nexus test. *Swinson v. Lords Landing*, 360 Md. 462, 477–78 [758 A.2d 1008] (2000).

> To satisfy the elements of Section 552, it is not necessary that the defendant know the identities of the specific parties who relied on the information provided. Rather, it is suffi-

---

8. As a variation on this contention, Premium argues that the question of privity should not have been resolved on summary judgment:

> But even if the question of Beneficial's knowledge of specific purchasers were relevant as to the issue of privity, the record in this case provides no evidence at all that Beneficial lacked such knowledge or that Beneficial did not engage Sanchez on behalf of specific purchasers. As a result, at a minimum, the question of contractual privity is subject to a dispute of fact and inappropriate for summary judgment.

We can dispose of this argument quickly. Premium's argument that the record is unclear as to Beneficial's knowledge of Sanchez's evaluations *vis-a-vis* its matching of specific investors to specific policies is unavailing because Premium, not Sanchez, had the burden of proof on the issue of tort duty. Thus, to the extent that Premium asserts that "Beneficial engage[d] Sanchez on behalf of specific purchasers," Premium needed to present supporting evidence to the circuit court and it did not.

cient that the plaintiff be within the class of persons for whose benefit the duty was created. The duty extends even to a large class of potential plaintiffs as long as the class is limited to the identifiable categories of persons who may be expected to rely upon the information provided.

(Quotation marks and some citations omitted.)

Ultimately, these contentions are not persuasive. Sanchez contracted only with Beneficial, not the investors. To hold that Sanchez owed a duty to the investors, whose very existence and roles in the transactions were unknown to him at the time he made his evaluations, would subvert the purposes of the limitations on the scope of tort duty applicable in cases in which only economic harm could result from a breach of duty. Application of the standards set out in Restatement (Second) of Torts § 552 does not change this result.

We will begin our analysis with a brief summary of the pertinent legal principles.

 The elements of the tort of negligent misrepresentation are:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Walpert v. Katz*, 361 Md. 645, 656–57, 762 A.2d 582 (2000) (internal quotation marks removed).

 "In Maryland, in order to establish a cause of action for negligence, a plaintiff must prove: a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach

of that duty; a causal relationship between the breach and the harm; and damages suffered." *Id.* at 655, 762 A.2d 582 (citing, among other authorities, *Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986)). "Negligent misrepresentation is one variety of a negligence action." *Walpert,* 361 Md. at 655-56, 762 A.2d 582.

In the law of negligence, the term "duty," or "tort duty," *Jacques,* 307 Md. at 533-34, 515 A.2d 756, is shorthand for " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Gourdine v. Crews,* 405 Md. 722, 745, 955 A.2d 769 (2008) (quoting W. Page Prosser *et al.,* PROSSER AND KEETON ON THE LAW OF TORTS § 53 at 356 (5th ed.1984)). In other words, "the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Gourdine,* 405 Md. at 745, 955 A.2d 769 (citing, among other authorities, *Pendleton v. State,* 398 Md. 447, 461, 921 A.2d 196 (2007) and *Rosenblatt v. Exxon,* 335 Md. 58, 77, 642 A.2d 180 (1994)).

"Duty is a foundational element in a claim of negligence because, as we have said, 'negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence.' " *Barclay v. Briscoe,* 427 Md. 270, 293, 47 A.3d 560 (2012) (quoting *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986)). As a result, "when analyzing a negligence action it is customary to begin with whether a legally cognizable duty exists." *Pendleton v. State,* 398 Md. 447, 461, 921 A.2d 196 (2007). If failure to use due care causes only a risk of economic loss, " 'courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent.' " *Walpert,* 361 Md. at 658, 762 A.2d 582 (quoting *Jacques,* 307 Md. at 534-35, 515 A.2d 756).

The term "intimate nexus" derives from Judge Cardozo's landmark opinion in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 182, 174 N.E. 441 (1931), wherein he used a variation of

the phrase to characterize the kinds of relationships that, in addition to actual contractual privity, establish tort duty when the only possible damages are economic. In *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), the New York Court of Appeals, after reviewing *Ultramares* and other cases, concluded that, in the context of a claim for negligent misrepresentation by an accountant, an "intimate nexus" exists when:

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

The *Credit Alliance* test was adopted by our Court of Appeals in the context of accountants' liability in *Walpert,* 361 Md. at 680–81, 762 A.2d 582. While *Credit Alliance* and *Walpert* dealt with accountants' liability, the analysis set out in the two decisions is a useful approach in the present case because this case also involves statements based on professional knowledge and expertise when those statements are made to assist others in financial matters.

In all of this, it is important to remember that the requirement of tort duty functions to limit a defendant's possible liability:

[T]he rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages [is] to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Stated differently, the reason for the requirement is to limit the defendant's risk to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed.

*Walpert,* 361 Md. at 671, 762 A.2d 582 (quoting *Ultramares,* 255 N.Y. at 179, 174 N.E. 441); *see also Barclay,* 427 Md. at

293, 47 A.3d 560 (" '[D]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " (quoting PROSSER AND KEETON ON THE LAW OF TORTS § 53 at 358 (internal quotation marks omitted))); *Weisman v. Connors*, 312 Md. 428, 447 n. 3, 540 A.2d 783 (1988) (In the context of negligent misrepresentation claims, "[t]he attempt to circumscribe the potentially limitless range of economic harm ... has been the raison d'etre for the requirement of duty.").

*A. Beneficial as an Agent for Undisclosed Principal(s)*

■ Premium's members were not in privity with Sanchez in the traditional sense of the term. In *Lovell Land v. SHA*, 408 Md. 242, 261, 969 A.2d 284 (2009), the Court of Appeals explained:

> "In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.*, that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. *It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.*"

(quoting *Mackubin v. Curtiss–Wright Corp.*, 190 Md. 52, 58, 57 A.2d 318 (1948) (emphasis added in *Lovell Land* )). The undisputed evidence before the circuit court was that Sanchez was unaware that Beneficial was acting on behalf of anyone other than itself when it requested him to perform life expectancy evaluations. Thus, the agreements between Sanchez and Beneficial cannot be said to have reflected an intention, clear or otherwise, on Sanchez's part that a person other than Beneficial was "the primary party in interest." Recognizing this, Premium asserts that Beneficial was acting as an agent for undisclosed principals when it requested Sanchez to perform his evaluations.

Premium bases this contention on language in the purchase authorization agreements between Beneficial and the individual investors in which Beneficial agreed "to represent Principal as agent, for the purpose of identifying, qualifying, and pur-

chasing life insurance policies and all related death benefits in the form of viatical settlements...." Each agreement contained criteria, in the form of an anticipated return on investment expressed in term of the viator's life expectancy, with a proviso that any policy purchased for the investor must be on the life of an "insured(s) ... diagnosed terminally ill and said diagnosis must be from an independent medical reviewing physician or team of physicians."

Premium argues that the purchase authorization agreements established a principal/agent relationship between the investors and Beneficial. In Premium's view:

> Sanchez had privity with every purchaser who, at the time Sanchez provided an evaluation, had delegated his or her authority to Beneficial to obtain a life expectancy (but whose funds had not yet been applied to the purchase of a policy).

Therefore, according to Premium, the individual investors were parties to the agreement between Sanchez and Beneficial.

As authority for this contention, Premium relies on the Restatement (Second) Agency § 302 (1958), which reads:

> A person who makes a contract with an agent of an undisclosed principal, intended by the agent to be on account of his principal and within the power of such agent to bind his principal, is liable to the principal as if the principal himself had made the contract with him, unless he is excluded by the form or terms of the contract, unless his existence is fraudulently concealed or unless there is set-off or a similar defense against the agent.

The Restatement (Second) of Agency has been superseded by the Restatement (Third) of Agency (2005). The Restatement (Third) articulates the general rule thus:

### § 6.03 Agent For Undisclosed Principal

When an agent acting with actual authority makes a contract on behalf of an undisclosed principal,

(1) unless excluded by the contract, the principal is a party to the contract;

(2) the agent and the third party are parties to the contract; and

(3) the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal made the contract personally, subject to §§ 6.05–6.09.

However, the general rule set out in § 6.03 is subject to exceptions. As Premium acknowledges in its brief, when it engaged Sanchez to prepare life expectancy evaluations, it was acting on behalf of a group of potential investors. Restatement (Third) § 6.05 sets out the rule when an agent acts on behalf of multiple undisclosed principals. It states in pertinent part:

### § 6.05 Contract That Is Unauthorized In Part Or That Combines Orders Of Several Principals

\* \* \* \*

(2) Two or more principals may authorize the same agent to make separate contracts for them. If the agent makes a single contract with a third party on the principals' behalves that combines the principals' separate orders or interests and *calls for a single performance by the third party,*

\* \* \* \*

(b) *if the principals are unidentified or undisclosed, the third party and the agent are the only parties to the combined contract;* and

(c) unless the agent acted with actual or apparent authority to bind each of the principals to the combined contract, (i) subject to [§ 6.03](1),[9] none of the separate principals is

---

9. Section 6.05(1) pertains to situations in which an agent-acting with actual or apparent authority to make a contract with a third party-makes a contract with that party in excess of its authority. It reads:

> (1) If an agent makes a contract with a third party that differs from the contract that the agent had actual or apparent authority to make only in an amount or by the inclusion or exclusion of a separable part, the principal is subject to liability to the third party to the extent of the contract that the agent had actual or apparent authority to make if

subject to liability on the combined contract; and (ii) *the third party is not subject to liability on the combined contract to any of the separate principals.*

(Emphasis added.)

Comment (c) to § 6.05 states in relevant part (emphasis added):

Unless an agent acts with actual or apparent authority to bind multiple principals to a single combined contract, if the agent combines or "lumps" the principals' orders or interests into a single contract with a third party, none of the principals is subject to liability on the contract. This is because none among the principals has manifested assent to the agent or the third party to be bound for the lumped or combined performance. *The third party is not subject to liability to any single principal on the contract that lumps the principals' orders or interests.* Moreover, the third party is not subject to liability to any one or more of the single principals for that principal's proportionate share of the performance due from the third party under the contract. The third party's manifestation of assent to be bound by the contract reflected a bargain for a given quantity or number. *The third party may set the price at which it is willing or able to perform with reference to that quantity or number.* However, under subsection (1), the third party may manifest its willingness to be bound to perform by, for example, tendering performance to a single principal of that principal's proportionate share of the lumped contract. See Comment b for further discussion.

While § 6.05 is generally applicable when an agent combines multiple orders of goods into one order with a third party, its rationale, as explained in comment (c), exposes a weakness in Premium's argument that a party to a contract with undisclosed principals owes a tort duty to them. From

(a) the third party seasonably makes a manifestation to the principal of willingness to be bound; and
(b) the principal has not changed position in reasonable reliance on the belief that no contract bound the principal and the third party.

Sanchez's perspective, Beneficial had neither express nor implied authority to act on behalf of potential investors. This is because Beneficial did not disclose the true nature of its business to him. Had it done so, Sanchez might well have declined to make the evaluations at all or, alternatively, to charge more for them. As comment (c) makes clear, Sanchez, as a party to a contract, has the right to set the price for his services and, we believe, to set other conditions as well. One such condition could quite reasonably be a limitation upon the number and nature of the persons to whom his opinion was disseminated. It would be unfair and unreasonable to conclude that Sanchez should be contractually bound to a numerically undetermined and undisclosed class of parties under the circumstances presented by this case and we decline to do so.

Moreover, assuming for purposes of analysis that the undisclosed investors were in privity of contract with Sanchez, we agree with the circuit court that privity in this case would be insufficient to establish the sort of "intimate nexus" required to establish a tort duty on Sanchez's part. As we have explained, courts have imposed the requirement of privity or its equivalent to limit what would otherwise be " 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' " *Walpert,* 361 Md. at 671, 762 A.2d 582 (quoting *Ultramares,* 255 N.Y. at 179, 174 N.E. 441). By requiring privity, we "limit the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed." *Id.*

As we have discussed, in *Walpert,* 361 Md. at 680–81, 762 A.2d 582, the Court adopted a three-step analysis for deciding whether an intimate nexus existing between an accountant and a party:

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

The holding in *Walpert* is limited to an accountant's duty liability but, as we have indicated, its analysis is helpful in the present case because, in a manner somewhat analogous to an accountant preparing a financial statement, Sanchez made statements based on his professional knowledge and expertise to assist Beneficial in financial decisions. Sanchez believed that his evaluations were going to be used by Beneficial to decide whether to purchase viatical policies; Sanchez had no knowledge that any entity other than Beneficial would rely on the evaluations and there is no evidence whatsoever of any conduct by Sanchez linking him to the investors or suggesting any understanding on his part that anyone other than Beneficial would rely on his assessments. Premium has failed to satisfy two of the three *Walpert* criteria. To accept Premium's claim that Sanchez owed a duty to the investors would expose him to the sort of indeterminate liability that the intimate nexus requirement is intended to prevent. Such a result would stand Maryland's requirement for an intimate nexus as a predicate for duty on its head.

*B. Section 552 of the Restatement (Second) of Torts*

 In addition to "privity or its equivalent," an intimate nexus can be established through the analysis set out in § 552 of the Restatement (Second) of Torts.[10] *100 Investment v. Columbia Town Center*, 430 Md. 197, 230, 60 A.3d 1 (2013). Premium contends that the circuit court erred in granting summary judgment in Sanchez's favor because Premium established an "intimate nexus" based on § 552. Citing *Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 556 A.2d 1126 (1989), and *Swinson v. Lords Landing Village Condo.*, 360 Md. 462, 477–78, 758 A.2d 1008 (2000), Premium maintains that, to satisfy § 552, "it is not necessary that the defendant know the identities of the specific parties who relied on the information provided. Rather it is sufficient that the plaintiff be within the class of persons for whose benefit the

---

**10.** In *Walpert,* the Court declined to apply § 552 but relied instead on a line of New York cases including *Credit Alliance* and *Ultramares.* 361 Md. at 680–81, 762 A.2d 582.

duty was created." Premium asserts that, because Sanchez knew that Beneficial was planning on using his evaluations to purchase life insurance policies, his interaction with Beneficial created a duty to benefit all those using his evaluations to purchase life insurance policies, including the investors. According to Premium, that Sanchez was unaware that Beneficial was merely acting as an agent for the investors is immaterial under § 552 because the investors belong to the class of persons who would be expected to rely on Sanchez's evaluations. Therefore, Premium contends, the facts satisfy § 552 and, accordingly, meet the "intimate nexus" test.

Premium is correct that, under § 552, the specific identity of the ultimate recipient of the statement is often not significant. However, in our view, the nature and number of the intended recipients is of critical importance under a § 552 analysis. Because Sanchez was misinformed as to both, § 552 is not a basis for concluding that he owed a tort duty to the investors. We will explain our reasoning.

Section 552 of the Restatement (Second) of Torts reads as follows (emphasis added):

§ 552. **Information Negligently Supplied for the Guidance of Others.**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance *he intends to supply* the information or *knows* that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he *intends* the information to influence or *knows that the recipient so intends* or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Comment (h) to § 552 states (emphasis added):

h. *Persons for whose guidance the information is supplied.* The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. . . .

Under this Section, . . . . [i]t is enough that the maker of the representation *intends it to reach and influence* either a particular person or persons, *known to him,* or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and *foreseeably to take some action in reliance upon it.* It is enough, likewise, that the maker of the representation *knows* that his recipient intends to transmit the information to a similar person, persons or group. . . . *It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.*

*In many situations the identity of the person for whose guidance the information is supplied is of no moment to the person who supplies it, although the number and character of the persons to be reached and influenced, and the nature and extent of the transaction for which guidance is furnished may be vitally important.* This is true because the risk of liability to which the supplier subjects himself by undertaking to give the information, while it may not be affected by the identity of the person for whose guidance the information is given, *is vitally affected by the number and character of the persons,* and particularly the nature and extent of the proposed transaction. . . .

The Court in *Walpert* explained that, "[f]or liability to attach under § 552, the plaintiff must be a member of a limited class to whom the [defendant] intends to supply the information or to whom the [defendant] knows the recipient intends to supply it, who suffers loss through reliance on the information for substantially the same purpose as the bona fide client." 361 Md. at 677, 762 A.2d 582. "Under this approach, not every reasonably foreseeable user of the ... information supplied by the [defendant] may recover for losses sustained in reliance." *Id.* (citing the Restatement (Second) of Torts, § 552 cmt (h), illus. 10).

Returning to the present case, the language of § 552 and comment (h) suggest that, had Beneficial told Sanchez that it was not purchasing viatical policies for its own benefit but was instead doing so as an agent for investors, Sanchez might owe a duty to those investors even if he did not know their specific identities. But Beneficial made no such statement to him. Sanchez was unaware of the existence of the investors and equally uninformed that his evaluations would be communicated to members of such a group. Sanchez's *understanding* as to how Beneficial was to use his evaluations—as opposed to how Beneficial actually used them—is of critical importance in determining the scope of Sanchez's duty under § 552 because, as comment (h) observes, "the risk of liability to which the supplier subjects himself by undertaking to give the information ... is vitally affected by the number and character of the persons" to whom the information is given. The mere possibility that Beneficial might disclose the evaluation to others is an insufficient basis to expand the scope of Sanchez's duty. The undisputed evidence shows that Sanchez had no inkling of Beneficial's actual role in the purchase of the viatical policies or Beneficial's actual use of his evaluations. Therefore, we hold that § 552 is not a basis for concluding that he had a tort duty to the investors.

In its contention that Sanchez had a tort duty to its members, Premium places particular reliance on *Village of Cross Keys v. U.S. Gypsum*, 315 Md. 741, 756–59, 556 A.2d 1126 (1989). *Village of Cross Keys* arose out of claims that the

exterior walls of a residential condominium building were defective. As summarized by the Court:

> The Council of Unit Owners of Harper House Condominium sued the Village of Cross Keys, Inc. (VCK) and the Rouse Company (Rouse), contending that VCK and Rouse, as developers of the Harper House building, were responsible for damages resulting from defective exterior walls. VCK and Rouse, hereinafter referred to collectively as the developer, in turn sued Frank O. Gehry & Associates, Inc., the design architect, for indemnity or contribution. The developer and the architect each sued United States Gypsum Company (USG), claiming that they relied upon USG's design for the construction of the exterior walls, and that the design and certain representations concerning it were faulty. USG filed motions to dismiss, contending, among other things, that ... it owed no legal duty to the developer or to the architect.

*Id.* at 743–44, 556 A.2d 1126 (footnotes omitted).

USG did not provide a design for the exterior walls to Gehry. Instead, USG prepared a bulletin containing technical information about its exterior wall system product and published it in *Sweet's Catalog,* a compilation of such information that was sold to architects, engineers and builders. *Id.* at 758 n. 6, 556 A.2d 1126. The developers and Gehry claimed (1) that they used the information in the bulletin to design the exterior wall system; (2) the information in the bulletin was incorrect; and (3) the errors in the bulletin were the result of USG's negligence. *Id.* at 747–48, 556 A.2d 1126. In response, USG argued that it owed no duty to the developers or Gehry because "it cannot be held liable for [the bulletin's] gratuitous publication to persons with whom USG had no dealings, but who were only a part of the 'vast, faceless crowd of *Sweet's Catalog* users.'" *Id.* at 757, 556 A.2d 1126 (footnote omitted).

In *dicta,* and referring to § 552, the Court indicated its "grave doubts concerning the vitality of that argument...." *Id.* at 758, 556 A.2d 1126. The Court explained that:

Although the group of persons who may be expected to rely upon information of this kind may be large, they are identifiable, particularly if the group is limited to architects and structural engineers. That their names cannot be known in advance is of no consequence. A trier of fact could find that the architects and engineers are the very persons whom USG intended to act on the information supplied.

*Id.* at 758–59, 556 A.2d 1126.

The *Village of Cross Keys* dicta certainly supports the conclusion that a manufacturer that publishes technical information about its products to design professionals to induce them to use them may owe a duty to those professionals. The Court's reasoning hinges on the fact that USG arranged for the publication of the bulletin in *Sweet's Catalog* so that architects and engineers could have access to it and that it was foreseeable that those professionals might rely on the information in the bulletin. The present case is very different. Sanchez sent his evaluations only to Beneficial and he had no knowledge that Beneficial disseminated them to others. There is nothing in this record from which a fact finder could conclude that the investors were "the very persons whom [Sanchez] intended to act on the information supplied."

## II. The Motion for Leave to File an Amended Complaint

 Premium argues that the circuit court abused its discretion in denying its request for leave to file an amended complaint to add a claim of breach of contract because the supporting facts of the claim were sufficiently set forth in the pending complaint. Premium contends that the circuit court abused its discretion in two ways: First, because amendments should be freely given; and second, because the basis upon which the court denied the request (the statute of limitations) was misplaced.

Premium focuses its attention on the latter argument, arguing that the circuit court abused its discretion in finding that the breach of contract claim was barred by the statute of limitations. Premium points out that the circuit court did not

find that Premium's negligence claims were barred by the statute of limitations. Because the breach of contract claim is based on the same facts as the negligence claims, Premium contends, its breach of contract claim relates back to the filing of the initial claims. If the negligence claims were not barred by the statute of limitations, a breach of contract claim also should not be barred. Because the circuit court applied an incorrect legal standard in denying Premium's motion, Premium concludes, the court abused its discretion.

Assuming that Premium is correct in its contention that its breach of contract claim is not barred by limitations, the circuit court nonetheless reached the correct result. As we stated in *Pope v. Board of School Commissioners of Baltimore City*, 106 Md.App. 578, 591, 665 A.2d 713 (1995), "an appellate court will affirm a circuit court's judgment on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.... [I]t is within our province to affirm the trial court if it reached the right result for the wrong reasons."

Here, we will affirm the circuit court's denial of leave to amend the complaint to add a claim of breach of contract because the breach of contract claim was irreparably flawed. *See RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 673–674, 994 A.2d 430 (2010) ("Although it is well-established that leave to amend complaints should be granted freely to serve the ends of justice ... an amendment should not be allowed if it would result in prejudice to the opposing party or undue delay, such as where amendment would be futile because the claim is flawed irreparably."). As we explained in Part I, the circuit court correctly determined that there was no contractual privity between Premium and Sanchez. A defendant cannot be held liable for breaching a contract if there is no contractual privity between the parties. Therefore, because there was no contractual privity, Premium's claim for breach of contract would be doomed from its inception. The circuit court reached the correct result on this issue and did not err in denying Premium's motion for leave to amend its complaint.

THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED.

APPELLANT TO PAY COSTS.