REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 496

September Term, 2014

---

BALFOUR BEATTY
INFRASTRUCTURE, INC.
v.
RUMMEL KLEPPER & KAHL, LLP

---

Leahy,
Reed,
Eyler, James. R.,
        (Retired, Specially Assigned)

JJ.

---

Opinion by Leahy, J.

---

Filed:  January 28, 2016

In this appeal we consider whether the economic loss doctrine applies to shield an engineering firm from tort claims brought by a contractor seeking damages for economic losses suffered in consequence of relying on the firm's allegedly defective designs and projections. Our holding is framed by the fact that, while the engineering firm and the contractor each had separate contracts with the government to perform work on the same design-bid-build construction project, there was no contract between the parties.

The City of Baltimore entered into a contract with Rummel Klepper & Kahl, LLP ("RK&K" or "Appellee"), a design engineering firm, to produce construction designs and associated documents for use by the successful bidder(s) on succeeding proposals for construction of the Patapsco Wastewater Treatment Plant. Fru-Con Construction Corporation, predecessor to Balfour Beatty Infrastructure, Inc. ("BBII" or "Appellant"),[1] was the successful bidder on the plant upgrade projects, and entered into Sanitary Contract 852R with the City in November 2009.

Just over four years later, BBII filed a complaint in the Circuit Court for Baltimore City against RK&K, claiming that, during construction, BBII ran into costly delays and complications in reliance on RK&K's allegedly defective designs and negligent misrepresentations concerning project timeline projections. The complaint sounded in tort, supported by the theory that RK&K had a duty to BBII based on the "intimate nexus" between them, and asserted three causes of action: 1) professional negligence, 2)

---

[1] BBII is a construction company organized under Delaware law and authorized to do business in Maryland.

1

information negligently supplied for the guidance of others under Restatement (Second) of Torts § 552, and, 3) negligent misrepresentation.

RK&K filed a motion to dismiss the complaint for failure to state a claim. RK&K's central argument was that the complaint sought recovery for purely economic losses, and, because there was no contractual privity or its equivalent between BBII and RK&K, the economic loss doctrine barred BBII's tort claims. The circuit court granted the motion to dismiss in an order entered on April 10, 2014.

We affirm. We hold that BBII failed to state a claim because, as a matter of law, in the absence of privity, death, personal injury, property damage, or the risk of death or serious personal injury, no duty of care in tort runs from an engineer or architect to a contractor for purely economic losses on a public construction project. In reaching this holding, we determine that Maryland does not expand the "intimate nexus" test to include extra-contractual concepts of duty for the recovery of solely economic losses in public construction cases.

## BACKGROUND

### Design-bid-build contracts

Under the "design-bid-build" project delivery method utilized by the City in this case, the owner first enters into a contract with an architect and/or engineer ("A/E" or "design professional") to design the project. Typically, the engineering and design is completed before the owner releases a request for proposals for a general contractor to

2

perform the work.[2]   1 Bruner & O'Connor Construction Law § 2:11 (2015).  Under this

method:

> (1) the design is fully developed and completed before the pricing of the
> work, thus, presumably resulting in lowest cost, and (2) selection among
> responsible and responsive bidders can be made on the basis of price alone.
> . . . the contractor is excluded from contributing to the design process. . .

*Id.*  The A/E and the contractor each have a contract with the owner, but they have no

contractual relationship with each other.

In contrast, integrated delivery methods, such as "design-build," create a single

point of responsibility because the A/E and the contractor are bound under a single contract

with the owner.  *Id.* at § 2:12.  Typically the contractor who is part of a design-build team

is involved in aspects of the design of a project from the beginning, and the A/E remains

involved—normally in an oversight and advisory role—during the construction phase.  *Id.*;

5 Bruner & O'Connor Construction Law § 17:52 (2015) (explaining the modern trend to

minimize the A/E's previous "substantial involvement in the construction process" to a

lesser obligation to "observe the work and determine in general if the work is being

performed in accordance with the contract documents.").[3]

---

[2] The owner may, in addition to hiring a general contractor to perform the work according to the A/E's design specifications, enter into a separate contract with the A/E firm, or a construction manager ("CM"), or a "CM-at-Risk" to oversee the work.  Robert F. Cushman *et al.*, *Proving & Pricing Construction Claims* § 9.03[A][1] (3d ed. 2015).

[3] We recognize the current trend in the construction industry to move away from the traditional design-bid-build project delivery method toward more integrated delivery methods that embrace a direct contractual relationship between the A/E and the contractor. *See* 1 Bruner & O'Connor Construction Law § 2:12 (2015) (acknowledging the dramatic increase in public use of the design-build project delivery method that "maximizes the cooperative and early involvement of design and construction professionals working

The traditional design-bid-build model often engenders tensions between the A/E

and the construction contractor, as explained in one treatise on the subject:

> A fundamental difficulty in allocating liability under the design-bid-build model is the inherent tension between the interests of the architect and contractor. Some contractors believe they can increase profits through change orders that are based on ambiguities, errors, or omissions in the architect's design. Architects have an interest in protecting their designs, and frequently serve as the owner's representative during construction. In these situations, it benefits the architect to resist any suggestion that the design is flawed and deny change order requests based on defective plans and specifications.
>
> Because of these competing interests, it can be difficult for the owner to determine whether the architect or contractor is responsible for a delay. . . . To complicate matters further, it may not be possible to join the architect and contractor in a single action[.]

Robert F. Cushman *et al.*, *Proving & Pricing Construction Claims* § 9.03[A][1] (3d ed.

2015). As discussed further *infra*, under traditional design-bid-build contracts, especially

in the public sector, the contractor normally has a contractual entitlement to recover against

the owner for construction delays and other benefit-of-the-bargain damages caused by the

A/E's defective specifications and designs.

---

together as part of a project team."); *see also* Patrick M. Miller, *2011 Construction Review: Design-Build*, 3 Construction Briefings (March 2012) (acknowledging the intensifying debate surrounding design and construction delivery methods and the gaining popularity of "integrated project delivery," including design-build, which contemplates designers and constructors working together from the project's conception); *see also* Sean Devenney and Gregg Bundschuh, *Is the Line Blurring Between General and Professional Liability*, 29 ABA Construction Lawyer 15 (Spring 2009) (noting that the "blurred lines between constructor duties and design duties raise significant questions in the construction insurance market given the traditional line between professional liability coverage for designers and commercial general liability for different aspects of work on a construction project.").

**RK&K's Professional Engineering Services Contract**

According to the complaint,[4] sometime prior to October 2009,[5] the City entered into a contract with RK&K for the design of two interrelated projects to upgrade the plant, termed the "Enhanced Nutrient Removal Facilities." According to BBII, the City's contract with RK&K specified that RK&K was to produce accurate, complete, and correct construction designs and drawings for use by the successful bidder(s) who would construct the plant upgrades. RK&K's duties and responsibilities allegedly included, but were not limited to:

- Development of the design for the two interrelated projects;

- Development and preparation of drawings and specifications for use by prospective contractors for preparing and submitting bids and ultimately for use by the successful contractor for the construction of the projects;

- Development of timelines for construction of the projects;

- Development and preparation of responses to questions regarding the design raised by prospective contractors during the bid phase;

- Review, evaluation, and comment on the proposals submitted by bidders/prospective contractors;

---

[4] As this appeal is from the grant of a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the evidentiary background will assume the truth of all well-pleaded facts and allegations in the complaint. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007) (citing *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531 (1995)).

[5] Neither BBII nor RK&K attached to the complaint or motion to dismiss any of the bid or contract documents (including Sanitary Contract 852R) for the Patapsco Wastewater Treatment Plant.

▪ Review, evaluation, and approval of various submittals from the successful contractor during construction related to the Work and RK&K's design;

▪ Review, evaluation, and inspection of the successful contractor's Work during construction to assure conformance with RK&K's design intent and design; and

▪ Review, evaluation, and acceptance of the successful contractor's Work and certification to the City regarding the same.

Thus, in addition to its pre-construction/design phase responsibilities, RK&K was allegedly assigned several construction-phase responsibilities, including: 1) evaluating and approving "various submittals" from the contractor related to the work and RK&K's design; 2) inspecting the contractor's work during construction to assure conformance with RK&K's design intent and design; and, 3) review, evaluation, and, if acceptable, certification of the contractor's work to the City.

**Sanitary Contract 852R**

Construction work for the projects under Sanitary Contract 852R ("SC 852") and Sanitary Contract 845R ("SC 845")[6] was to be completed at the same time, although SC 852 was let out for bid prior to SC 845. After it was pre-qualified by the City as capable

---

[6] To the extent one can glean something more about these projects from their titles, we note that SC 852 is identified as "Denitrification and Related Work for the Enhancement Nutrient Removal Facilities at Patapsco Wastewater Treatment Plant." SC 845 is identified as "Nitrification Filters and Related Work for the Enhanced Nutrient Removal Facilities at Patapsco Wastewater Treatment Plant."

6

of performing the work, Fru-Con Construction Corporation (predecessor in interest to BBII) bid on the SC 852 project, directly relying upon RK&K's documents and designs.[7]

On November 20, 2009, Fru-Con Construction Corporation and the City entered into a contract for the SC 852 project ("Contract"). Several years later, on January 1, 2014, the City agreed to an assignment of the Contract from Fru-Con Construction, LLC, to BBII.[8] Under the Contract, BBII was to, "among other things," construct thirty-four "[d]enitrification filter cells ('DNF cells') adjacent to the existing wastewater facility." DNF cells are "enormous, concrete tubs that hold massive amounts of wastewater to be treated." The Contract also required BBII to construct pipes and pipe support systems for the SC 852 project.

**BBII's Complaint**

In its complaint filed on January 6, 2014, BBII related that RK&K designed the DNF cells to expand or contract at keyed joints located in their concrete walls to accommodate fluctuating water pressure. BBII constructed the DNF cells in accordance with RK&K's designs, but, when the water retention integrity of the DNF cells was tested,

---

[7] RK&K, in its memorandum of points and authorities, alleges that BBII has contracts with the City for both projects—SC 852 and SC 845. RK&K states further that "[f]or reasons known only to the pleader, [BBII] has declined to allege that it holds the contracts with the City for both of the projects."

[8] The Contract was initially assigned on May 24, 2011, with the City's consent, from Fru-Con Construction Corporation to Fru-Con Construction, LLC. BBII then acquired all membership interests in Fru-Con Construction, LLC, and by January 1, 2014, BBII had fully absorbed Fru-Con Construction, LLC as a division of BBII. The record before us is not sufficient to discern which events discussed in the complaint occurred before BBII assumed the Contract, but, given that such distinction has no obvious legal significance in this appeal, we refer only to BBII throughout this opinion.

BBII learned that the cells were leaking due to cracks in the expansion and contraction joints. BBII alleged that these cracks and the associated leaks were a direct result of deficiencies in RK&K's design and that it cost BBII substantial additional time and expense to remediate the problems. BBII also claimed that, once construction was underway, it discovered RK&K's design for the pipe support system was defective, and again, suffered substantial additional time and cost remedying RK&K's allegedly defective pipe system design.

Finally, BBII contended that RK&K delayed completion of its design of the companion project, SC 845, and that RK&K knew that any delays in the design of SC 845 would delay BBII's ability to complete work on SC 852 and expose BBII to substantial costs and expenses. BBII alleged RK&K failed to properly establish a reasonable contract duration or project timeline for SC 852, and, instead, supplied false information to prospective contractors who were developing their estimates and competitive bids for the projects.

Predicated on these factual allegations, BBII asserted a claim for Professional Negligence (Count I), Restatement (Second) of Torts § 552 (Court II), and Negligent Misrepresentation (Count III). In Count I, BBII claimed that it was a forseeable party that would directly rely upon RK&K's professional services and designs, and, that "based upon the intimate nexus between [RK&K's] design and [BBII's] work as well as the contractual privity equivalent that exists between [RK&K] and [BBII], [RK&K] owed [BBII] a duty to act with a reasonable degree of care, knowledge, diligence and skill ordinarily possessed and exercised by similarly situated design professionals." BBII demanded an estimated

8

$10 million in damages for "increased and additional labor, materials, equipment and subcontractor costs, investigative costs, consultant fees, remediation costs, and delay costs." In Count II (Restatement § 552 for "Information Negligently Supplied for the Guidance of Others"), BBII contended that it suffered damages "[a]s a direct and proximate result of [RK&K's] failure to exercise reasonable care in preparing, supplying and communicating the design, including plans and specifications, for the Project."

Finally, in its third count for negligent misrepresentation, BBII posited that, as a result of the overlapping responsibilities of RK&K in both the design and construction phases of the project, and, because RK&K knew that BBII would rely on RK&K's design and project duration schedule, "an intimate nexus and contractual privity equivalent exists between [RK&K] and [BBII]." According to BBII, RK&K knew that the design of SC 845 was not sufficiently complete so as to allow SC 582 to be constructed within the contract schedule, and RK&K failed to warn BBII that the prices and ultimate costs of completing SC 852 would far exceed estimates.

**Motions Before the Circuit Court**

After it was served with a copy of the complaint, on January 29, 2014, RK&K filed a motion to dismiss for failure to state a claim in the circuit court. In its memorandum of points and authorities, RK&K argued that BBII failed to plead any facts that would support finding the existence of a legally cognizable duty in tort running from RK&K to BBII.

Invoking the "economic loss rule," RK&K argued that, in the construction industry, in the absence of privity or death, injury or a genuine risk of death or serious personal injury or property damage, no duty is owed by an architect or engineer to a contractor

9

where the loss or damage alleged is economic in nature. RK&K asserted that there was no contract between the parties, and argued that the "intimate nexus" and Restatement (Second) of Torts § 522 concepts of extra-contractual duty have never been applied in Maryland to design professionals in the construction field. Nonetheless, RK&K contended that BBII failed to allege facts that would allow a court to find the parties shared an "intimate nexus" or "professional/client relationship." RK&K asserted that, for example, there were no allegations in the complaint regarding any specific communications between RK&K and BBII before or during construction, or consultations between BBII and RK&K on BBII's bid or schedule assumptions.

RK&K advanced the principles that support the economic loss rule as applied in the construction industry; namely, that common variables and "unknowns"—such as hidden site conditions, owner-directed changes, material and labor shortages, price escalations, defective materials, change orders and errors—are addressed through contracts that allocate risks and provide mechanisms for the assertion of claims and resolution of disputes. RK&K asserted that "[w]hen considered in the construction industry context," BBII's "pitch to apply tort principles in order to bypass its bargained-for rights . . . [is] a disruptive tactic that only can undermine public confidence in public procurement."

In its response filed February 20, 2014, BBII argued that RK&K misconstrued Maryland case law because the "economic loss rule" applies to products liability claims and was not meant to be a shield for professional malpractice. BBII defended its failure to allege facts detailing the provisions of BBII's contract(s) with the City because the causes of action alleged in the complaint were separate from any claims BBII may have

10

had against the City. BBII challenged RK&K's assertion that the complaint failed to allege facts showing a relationship between RK&K and BBII on the ground that the complaint alleged that BBII was one of a limited group of pre-qualified, prospective contractors and that RK&K knew the City's prospective contractors would directly rely upon RK&K's design in preparing their bids. Finally, BBII argued that under Maryland law, a plaintiff seeking purely economic losses is not foreclosed from bringing an action for negligent misrepresentation.

RK&K replied, adding that tort liability should not be extended in this case because the "Spearin Doctrine" should have sheltered BBII from the risk of suffering the benefit-of-the-bargain type economic damages alleged in the complaint.[9] The doctrine, as enunciated in *United States v. Spearin*, applies specifically to construction projects and provides that "if the contractor is bound to build according to plans and specifications

---

[9] RK&K also noted that BBII failed to include anything in the complaint concerning BBII's responsibilities as they relate to the construction and administration of the projects under its contract with the City, or the costs therefor; or mention the City's procurement and administrative dispute resolution procedures, or the status of BBII's claims, if any, under the City's administrative dispute resolution process. RK&K cites to Baltimore City's comprehensive and detailed "Green Book," which defines the rights, roles and responsibilities of the City and its contractors. City of Baltimore Department of Public Works, Specifications: Materials, Highways, Bridges, Utilities, and Incidental Structures (2006) (the "Green Book") *available at* http://archive.baltimorecity.gov/Portals/0/agencies/general%20srvcs/public%20download s/City%20of%20Baltimore%20Specifications%20(Green%20Book).pdf. The Green Book specifications, which generally apply to City construction projects, include provisions that allow a contractor to assert claims against the City for "damages, losses, time, costs and/or expenses, alleged to have been sustained, suffered or incurred by [contractor] in connection with the Project." Green Book § 00.73.84 (1)(a). The Green Book also sets out the claims processes and procedures for contractors. *See* Green Book at § 00.73.84 Claims or Disputes.

11

prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." 248 U.S. 132, 136 (1918) (citations omitted); *see also Dewey Jordan, Inc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 258 Md. 490, 498 (1970) ("the contracting authority impliedly warrants that the plans and specifications are adequate and sufficient for the purpose intended and that the contractor is entitled to be compensated for delays in work occasioned by faulty plans and specifications."). Thus, RK&K argued, that if its designs were indeed defective, and if BBII had a right to rely on them (as BBII alleged in the complaint), then BBII would have been entitled to reimbursement from the City for any extra costs incurred under its contract with the City under the *Spearin* doctrine. On the other hand, if BBII could not establish that RK&K's designs were defective, or if it was determined that BBII failed to follow or properly interpret the designs, then BBII's tort claims would fail as well.

On March 14, 2014, BBII filed a motion for leave to file a sur-reply. BBII argued that RK&K misapplied the *Spearin* Doctrine because, although courts have held that the contracting authority impliedly warrants that plans and specifications supplied under the contract are adequate, and that the contractor is entitled to be compensated for certain costs and delays, those courts have never held that the implied warranty was a "limitation on a contractor's ability to pursue another, viable cause of action."

On April 2, 2014, the Circuit Court for Baltimore City heard argument from counsel on the pending motion to dismiss. At the close of the hearing, the circuit court orally granted RK&K's motion, finding that there was no privity between the parties giving rise to a tort duty under the current law in Maryland.

12

BBII filed a motion to reconsider on April 7, 2014, along with a memorandum of law, arguing (1) that privity is not a requirement for a claim under Restatement (Second) Torts § 552, or negligent misrepresentation, and (2) the circuit court did not consider the "equivalent of privity" between BBII and RK&K to support BBII's professional negligence claim. On May 6, 2014, the circuit court denied BBII's motion for reconsideration, and, on May 15, 2014, BBII noticed a timely appeal.

BBII presents three questions:

I.   Does an engineer owe a duty to a contractor when the engineer is aware that the contractor will rely upon the engineer's services to the contractor's detriment if the engineer's services are negligently performed, even though no contract exists between the engineer and contractor?

II.  Does a contractor have a cause of action under Restatement of Torts (Second) § 552 against an engineer for negligently supplied information when the design professional knew the contractor would rely upon the information supplied and be harmed by the engineer's negligence?

III. Does a contractor have an action for negligent misrepresentation against an engineer when the engineer: (a) intended the contractor to rely upon the representations (i.e., design); (b) knew that the contractor would rely upon the design; and (c) knew that the contractor would be harmed if the design was negligently performed?

## DISCUSSION

### Standard of Review

Appellate courts "review[] the grant of a motion to dismiss for legal correctness." *Rounds v. Maryland-Nat. Capital Park and Planning Comm'n*, 441 Md. 621, 635 (2015) (citing *Patton v. Wells Fargo Financial Maryland, Inc.*, 437 Md. 83, 95 (2014); *Heavenly Days Crematorium, LLC v. Harris, Smariga & Assocs., Inc.*, 433 Md. 558, 568 (2013)).

13

The circuit court, when considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, must view all well-pleaded facts and allegations in the complaint as true. *Lloyd*, *supra*, 397 Md. at 121 (citing *Morris*, *supra*, 340 Md. at 531; *Sharrow v. State Farm Mutual Ins. Co.*, 306 Md. 754, 768 (1986)). The court may grant the motion only if the allegations and inferences, assumed to be true, do not state a cause of action. *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 496-97 (2014) (quoting *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643-44 (2010)). When the claim at issue is in tort, the court "merely determines [the plaintiff's] right to bring the action," and does not decide whether the claims are meritorious. *Figueiredo-Torres v. Nickel*, 321 Md. 642, 647 (1991). We apply the same standards and determine only whether the circuit court's decision was legally correct, according no special deference to the circuit court's legal conclusions. *Heavenly Days Crematorium,* 433 Md. at 568 (citations omitted).

## I.

### Professional Negligence

BBII asserts that RK&K is liable under a professional negligence theory for the economic losses BBII sustained performing construction work under BBII's contract with the City in reliance upon RK&K's allegedly defective designs. According to BBII, RK&K breached a duty to BBII to act with the reasonable care of a design professional in creating designs for the SC 852 project, and in "failing to establish a reasonable duration" for the construction of the project.

14

The elements required to establish a cause of action for professional negligence are equivalent to the elements required in a standard negligence action; the professional, however, is held to the standard of care that prevails in his or her profession. *See Crockett v. Crothers*, 264 Md. 222, 224-25 (1972). "[O]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts § 299A (1965). To sustain a cause of action for negligence, a complaint must allege facts sufficient to support a finding of: 1) a duty to the plaintiff (or to a class of which the plaintiff is a part), 2) a breach of that duty, and 3) a causal relationship between the breach and the harm, and 4) damages suffered. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655 (2000) (citing *Jacques v. First Nat'l Bank,* 307 Md. 527, 531 (1986); *Cramer v. Hous. Opportunities Comm'n,* 304 Md. 705, 712 (1985); *Scott v. Watson,* 278 Md. 160, 165 (1976); *Peroti v. Williams,* 258 Md. 663, 669 (1970)). "Absent a duty of care, there can be no liability in negligence." *Id.* (citing *W. Va. Cent. v. Fuller*, 96 Md. 652, 666 (1903)). The *Walpert* Court further clarified:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or fact, if there has been no breach of duty."

*Walpert,* 361 Md. at 655 (quoting *W. Va. Cent.*, 96 Md. at 666). In *Jacques*, the Court of Appeals instructed that two major considerations in determining whether a tort duty should

15

be recognized in a particular context are "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." 307 Md. at 534.

### A. The Economic Loss Doctrine

Most states recognize that lack of privity between the parties is not, alone, a bar to a negligence claim. *See Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 32 (1986) ("In following the modern trend, we hold that privity is not an absolute prerequisite to the existence of a tort duty."); *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 939 (Me. 1982) ("We hold, therefore, that lack of privity does not constitute a bar to an action alleging negligence on the part of the manufacturer"); *Barni v. Kutner*, 76 A.2d 801, 803 (Del. Super. Ct., 1950) (stating that "lack of privity is no defense in a negligence case under certain conditions.") (citation omitted)). But in cases such as the one presented here, in which a contractor sustains higher than anticipated costs based on the allegedly defective designs of an engineering firm with which it has no contract, states are divided over whether and in what circumstances a negligence claim to recover the costs is barred by the "economic loss doctrine."

The general rule is that a party cannot recover against another in tort where the resulting harm is purely economic loss and the parties have no contract between them. *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927); *see also U.S. Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 156 (1994). The recovery of purely economic, benefit-of-the-bargain-type damages has long been limited in the United States. In *Robins,* Justice Holmes addressed the issue in a suit brought by the charterers of a

steamship against a dry dock for damages for loss of the use of the vessel. *Id.* at 307. The dry dock company was contractually responsible to the vessel owner to perform periodic servicing. *Id.* When the dry dock company negligently broke a propeller, the Supreme Court held that the charterers could not recover their economic damages from the dry dock, either as third-party beneficiaries to the owner's service contract, nor for the dry dock company's negligence. *Id.* at 308-09. Justice Holmes explained:

> [The charterer's] loss arose only through their contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action, no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. The law does not spread its protection so far.

*Id.* at 308-09 (internal citations omitted).

In Maryland, we acknowledge that "'the first obstacle which arises [to imposition of a duty] is the fact that there has been no direct transaction between the plaintiff and the defendant, which usually is expressed by saying that they are not in 'privity' of contract.'" *Whiting-Turner*, 308 Md. at 26 (quoting *Prosser and Keeton on the Law of Torts* § 18.5, at 708-10 (2d ed. 1986). The rationale supporting the requirement of privity (or, as we shall explain *infra*, a "privity equivalent") as a condition to the recovery of economic damages for negligent conduct is "to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Walpert,* 361 Md. at 671 (quoting Chief Judge Cardozo in *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931)). Still, Maryland courts have established that the economic loss doctrine does not always apply to bar recovery of economic damages. *See, e.g., Lloyd*, 397 Md. at 121 (stating that the economic loss

17

doctrine will not bar a claim for products liability where the product at issue [defective car seats that collapse rearward in rear-impact collisions] creates a dangerous condition that "gives rise to a *clear danger of death or personal injury*." (citation omitted)); *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 254-60 (1994) (stating that economic loss can be recovered for property damage through strict products liability claims where the damage is caused by "unreasonably dangerous products."); *Cash & Carry America, Inc. v. Roof Solutions, Inc.,* 223 Md. App. 451, 468-470 (2015) (holding that the economic loss doctrine did not bar a negligence claim against a contractor by a third party where the risk of harm was personal injury and property damage).[10]

In construction matters, the law in Maryland contours more narrow circumstances under which the economic loss doctrine does *not* bar tort claims for purely economic loss. As explored further below, a construction contractor's ability to recover for economic losses against a design professional where there is no contractual privity is generally limited to situations involving death, personal injury, property damage, or the risk of death or serious personal injury. *See Whiting-Turner*, 308 Md. at 35.

    i.    **Privity, Property Damage, Death, Injury, or the Risk of Death or Serious Personal Injury**

---

[10] In *Cash & Carry America,* we observed that the economic loss doctrine has been expanded in some states, limited in others, and given way to "'vast confusion over this area of law.'" 223 Md. App. at 466, n.6 (quoting *David v. Hett*, 270 P.3d 1102, 1105 (2011)); *see also LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 242, n.32 (Tex. 2014) ("'The confusing mass of precedent relating to tort liability for economic loss has yet to be disentangled and expressed with the clarity commonly found with respect to other tort law topics.'") (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 546 (2009)).

18

In *Whiting-Turner*, the Court of Appeals held that builders and architects have a duty, even where no privity exists between the parties, to use due care in the design, inspection, and construction of a project that extends to "persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence." 308 Md. at 22. In *Whiting-Turner*, a condominium owners' association brought a negligence action against the general contractor, developer, and architects of a building, alleging that their negligence had resulted in the deficient construction of the building and created a fire hazard that "present[ed] a threat to the safety and welfare of the owners and occupants. . . ." *Id.* at 22-23. The unit owners also alleged, *inter alia,* that, in advertising and selling the units, the developer negligently misrepresented "the building's suitability for occupancy." *Id.* at 23.

The builder and certifying architects filed motions to dismiss, contending that the complaint failed to allege facts sufficient to show they owed a duty of care to the unit owners. *Id.* The defendants argued that a duty should not be recognized because the unit owners had only suffered economic loss, not personal injury or property damage. *Id.* at 23-24. The trial court concluded it was bound by the Court of Appeals' statement in *Marlboro Shirt*, that "'a contractor owes no duty to the general public for which it may be made responsible in an action in tort for negligence if it does not perform its contract.'" *Id.* at 29 (quoting *Marlboro Shirt Co., v. Am. Dist. Tel. Co.,* 196 Md. 565, 571-72 (1951)).

The Court of Appeals distinguished *Marlboro Shirt* because it involved an action solely for injury to personal property and the plaintiffs did not allege the contractor created any risk of personal injury. *Id.* The Court then turned to the question of whether a

19

negligence action may be maintained against a builder or architect in a situation in which the risk of personal injury existed but no personal injury occurred. *Id.* at 30-31. The Court concluded that

> the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition.[11]

*Id.* at 35 (footnote omitted).

Eight years later in *Chambco, Div. of Chamberlin Waterproofing & Roofing System, Inc. v. Urban Masonry Corporation*, 101 Md. App. 664 (1994), *vacated on other grounds*, 338 Md. 417 (1995), this Court reviewed the development and application of *Whiting-Turner* since its publication. *Chambco* addressed a claim of negligence asserted by a roofing subcontractor against a masonry subcontractor, both of whom had contracts with the general contractor but not each other. 101 Md. App. at 667-68. The Court held that *Whiting-Turner* was a "narrowly drawn opinion," concluding that, "in Maryland, there have been no substantive expansions of the *Whiting-Turner* theory of negligence actions in building construction cases." *Id.* at 672, 680. Because the appellant only suffered economic losses, was not in privity of contract with the appellee, and did not allege that

---

[11] The Court explained the nature of the risk intended by its holding:

> It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice.

*Whiting-Turner*, 308 Md. at 35 n.5.

the negligence created a risk of death or personal injury, this Court determined in *Chambco* that the cause of action did not fit within *Whiting-Turner* and there was no cause of action absent privity of contract. *Id.* at 680-81.

In *Heritage Harbour, L.L.C. v. John J. Reynolds, Inc.*, developers brought an action seeking indemnification and contribution from the original developers, contractors, and architects of a condominium in relation to an underlying action brought against the developer by the owners of the condominium for "numerous structural and non-structural defects in the buildings . . . ." 143 Md. App. 698, 702-03 (2002). This Court clarified that the appellees must have had an original duty to the condominium owners in the underlying suit in order to be liable to appellants for contribution and/or indemnity. *Id.* at 706. The appellants needed to "plead clear facts that would support a finding of extreme danger and an imminent risk of severe personal injury," to circumvent the economic loss doctrine in order to find tort liability. *Id.* at 708 (citing *Morris*, *supra*, 340 Md. at 536). Because the appellants "failed to allege the existence of any substantial risk to persons or property," this Court, relying on *Whiting-Turner*, concluded that "their claims are precluded by the Economic Loss Doctrine." *Id.*

We recently held that the economic loss doctrine did not apply to bar a third party's negligence claim against a contractor for damage to property where the *risk* of harm (personal injury and property damage from misuse of a torch and resulting fire) was not solely economic in *Cash & Carry America*, 223 Md. App. at 468-470. After reviewing established principles governing application of the doctrine, we explained that "the economic loss doctrine serves as a boundary between contract law, the purpose of which

21

is to enforce the expectations of the parties to an agreement, and tort law, the purpose of which is to protect people and property from foreseeable risks of harm by imposing upon others a duty of reasonable care." *Id.* at 466 (citing *East River S.S. Corp.* v. *Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986)).

Here, BBII's complaint does not allege any facts that would support a finding that there was any risk of serious injury or death, nor does BBII argue that the alleged negligent actions of RK&K created such a risk. BBII also made no claim of damage to property. Therefore, the economic loss doctrine bars BBII's claim of professional negligence against RK&K for purely economic losses. *See Whiting-Turner*, 308 Md. at 35; *Chambco*, 101 Md. App. at 680-81; *Heritage Harbour*, 143 Md. App. at 708.

## ii. The "Privity Equivalent" Analysis Does Not Apply

BBII asks this Court to hold for the first time, that where there is no contract between a construction contractor and a design professional in a negligence action for the recovery of purely economic losses, an intimate nexus, and therefore a duty in tort, can be established by demonstrating a "privity equivalent" between the parties. BBII argues that, as stated in the complaint, its relationship with RK&K satisfies the intimate nexus test because BBII was not a member of an "indeterminate class," but, rather, as bidder on the contract with the City, was known to RK&K as an entity that would rely on RK&K's schematics after winning the bid for the contract. Thus, RK&K owed a duty to BBII to act with reasonable care.

In riposte, RK&K states that no Maryland appellate court has recognized a tort claim by a contractor against a not-in-privity design professional for the type of damages

22

allegedly suffered by BBII. RK&K's principal argument relies on policy—that Maryland contract law allows government contractors to recover against the owner in negligent design cases under the *Spearin* Doctrine, and that many state supreme courts have expressly denied recovery for contractors against architects, engineers, and designers. RK&K contends that the intimate nexus analysis does not apply to this case at all, but that even if it did, RK&K owed no duty to BBII because the circumstances alleged in the complaint do not rise to the level of privity or its equivalent. RK&K maintains that no facts were alleged in BBII's complaint concerning "any design-phase interactions" between RK&K and BBII.

As we next explain, although we agree that the law does not impose a duty of care that would sustain an action for professional negligence against RK&K on the complaint filed in this case, we do not adopt RK&K's blanket contention that the intimate nexus analysis does not apply in construction contract cases. Rather, we hold that in government construction matters such as the case on appeal,[12] the intimate nexus analysis is not expanded to include "privity equivalent" concepts of extra-contractual duty for the recovery of solely economic losses.

Generally, "when the failure to exercise due care creates a risk of economic loss only, and not the risk of personal injury, we have required an 'intimate nexus' between the parties as a condition to the imposition of tort liability." *Swinson v. Lords Landing Vill.*

---

[12] We limit our holding to cases involving government construction cases and do not reach whether or not intimate nexus concepts of extra-contractual duty may be applied in a private-sector construction case.

*Condo.*, 360 Md. 462, 477 (2000) (citing *Jacques*, *supra*, 307 Md. at 534; *Village of Cross Keys v. U.S. Gypsum Co.,* 315 Md. 741, 753 (1989)).[13]  We trace the term to Chief Judge Cardozo's landmark opinion in *Ultramares Corp.*, *supra*, wherein he described the kinds of relationships that may form a tort duty where the "intimacy of the resulting nexus" formed by transactions between the parties are "so close as to approach that of privity, if not completely one with it."  *Ultramares Corp.*, 255 N.Y. 170, 182-83.  An "intimate nexus," therefore, "is satisfied by demonstrating contractual privity or its equivalent." *Premium of Am., LLC v. Sanchez*, 213 Md. App. 91, 108 (2013) (some internal quotations omitted) (quoting *Walpert*, *supra*, 361 Md. at 658).

The intimate nexus analysis has been applied in Maryland to permit recovery of economic loss in suits between: a bank and its client, *see Jacques*, 307 Md. at 534-35; a title company and a purchaser of real property, *see 100 Inv. Ltd. P'ship v. Columbia Town Center Title Co.*, 430 Md. 197, 225 (2013); and an accounting firm and a third-party investor, *see Walpert*, 361 Md. at 693-94.  *See also Sanchez*, 213 Md. App. at 95, 108-15 (2013) (applying the intimate nexus analysis to the marketing of viatical settlements, an "unusual context").

In *Jacques*, the Court held a bank liable for the economic losses of its customer where the bank expressly agreed to process an application for a loan, accepted consideration for the processing, and promised a guaranteed rate of interest as an

---

[13]  Accordingly, when the risk created is one of personal injury, "no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability." *Jacques*, 307 Md. at 535 (citations omitted).

24

enticement to the customer to deal with the bank. 307 Md. at 528, 537-38. The court found that the relationship and dealings between the parties amounted to a contract and that the contract contained an implied promise to use reasonable care. *Id.* at 540. The court further noted that the customers were "particularly vulnerable and dependent" on the Bank exercising due care and that the Bank "had knowledge" and was "well aware" that its customers would be legally obligated to proceed to settlement with the loan determined by the Bank or forfeit their deposit. *Id.* at 540-41.

In *Walpert*, the Court of Appeals held that accountants may be held liable for negligence to a non-contractual party when there exists a connection equivalent to privity between the parties. 361 Md. 645. There, the Court found that an accounting firm that had prepared a financial report for a business in a negligent manner was liable to a third party who relied on the report in deciding whether to loan the business money and then suffered economic damages. *Id.* at 692-94. The Court applied the three-prong test for "privity equivalent" developed in *Credit Alliance Corp. v. Arthur Anderson*, 483 N.E.2d 110 (N.Y. 1985), which requires that the plaintiff show "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." *Walpert,* 361 Md. at 674, 692. The Court of Appeals concluded that this approach reflected the same policy reported in prior Maryland cases involving negligence claims brought by non-contractual third parties, and it "limit[ed] the unpredictable and unlimited nature of economic

25

damages." *Id.* at 675 (citation omitted). The Court supported this approach as it "[sought] to recognize and give effect to the current commercial reality in which the certified public accountant plays a major role in assuring the reliability of financial statements." *Id.* at 676. In reaching its holding, the *Walpert* Court focused on the third prong of the test—the requirement for conduct linking the parties—and concluded that the accountant's proven knowledge that the third party would rely on the report satisfied the legal privity equivalent. *Id.* at 684-92.

Maryland state appellate courts have not applied the "privity equivalent" test in a construction case sounding in tort for economic damages against a design professional. Indeed, a number of cases have emerged in other states discouraging the application of any exception to the economic loss rule in a case involving the construction industry. *See Berchauer/Phillips Construction Co. v. Seattle School* District, 881 P.2d 986 (Wash. 1994) (holding that, under the economic loss rule, a contractor was not allowed to recover purely economic damages from a design professional in tort and recovery was limited to remedies provided by the construction contract); *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004) (holding that the economic loss rule barred the subcontractor's negligence and negligent misrepresentation claims against an engineering firm and inspector), *declined to extend by S K Peightal Engineers, LTD v. Mid Valley Real Estate Solutions V, LLC*, 342 P.3d 868 (Colo. 2015); *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234 (Tex. 2014) (holding that a contractor could not recover the increased costs of performing its construction contract with the owner in a tort action against the project architect for alleged errors in the plans and specifications); *see also* William Powers, Jr. & Margaret Niver,

26

*Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 Tex. Tech L. Rev. 477 (1992). These cases, some of them cited by RK&K in its brief, view construction as a distinctive industry which relies on "a network of contracts to allocate [] risks, duties, and remedies. . . ." *BRW*, 99 P.3d at 72. These courts caution that "certainty and predictability in allocating risk would decrease and impede future business activity" if courts allowed parties working on a construction project to recover in tort for economic loss against A/E firms where there is no privity. *Berchauer/Phillips*, 881 P.2d. at 992.

There are, however, states that have extended extra-contractual concepts of the "intimate nexus" analysis in construction industry cases. For example, the Ohio Eighth District Court of Appeals held that lack of privity is not an absolute bar to a design professional's malpractice action when there is a nexus that can serve as a substitute for privity. *Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.* 628 N.E.2d 143, 146 (Ohio Ct. App. 1993). In *Clevecon*, the court of appeals upheld the lower court's denial of a design professional's motions for summary judgment and for directed verdict where the design professional was "extensively involved in supervision and administration . . . [and] reasonable minds could find that a sufficient nexus existed between the parties to substitute for privity of contract." *Id.* at 147. *See also Nicholson v. Turner/Cargile*, 669 N.E.2d 529, 535 (Ohio Ct. App. 1995) (concluding that "a design professional who exercises 'excessive control over the contractor' through the power to stop the work and give orders about the project is liable for such economic damages." (citing *Clevecon*, 628 N.E.2d at 147)).

Similarly, the Supreme Court of Appeals of West Virginia held that the lack of privity was not an absolute bar to recovery for economic damages in tort against a design

27

professional where there was a "special relationship" between the parties. *E. Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 275 (2001). In *E. Steel*, the appellate court reversed the circuit court's grant of summary judgment to a design professional in a professional negligence action where the design professional and contractor were separately employed by the same project owner. *Id.* The court held that "a design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two. Consequently, the contractor may, upon proper proof, recover purely economic damages in an action alleging professional negligence on the part of the design professional." *Id.* at 275.

We return to the threshold considerations presented at the beginning of this discussion to determine whether, in Maryland, we should extend the "privity equivalent" concept of extra-contractual duty in an action for professional negligence in a public construction industry case that does not involve a risk of death, serious injury, or property damage. Accordingly, whether to find a duty in tort, we must examine "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques*, 307 Md. at 534. The *Jacques* Court observed:

> We discern from our review of the development of the law of tort duty that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. *As the magnitude of the risk*

28

*increases, the requirement of privity is relaxed-thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury.* Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty.

*Jacques*, 307 Md. at 537 (emphasis supplied). "[D]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Sanchez*, 213 Md. App. at 110 (some internal quotations omitted) (citing Prosser and Keeton on the Law of Torts § 53 at 358.) "In other words, 'the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Id*. at 108 (citing *Gourdine v. Crews*, 405 Md. 722, 745 (2008)).

A contractor performing work on a government design-bid-build contract is typically covered by its contract with the government, and protected under the *Spearin* doctrine as well, against the risk of loss arising from defective engineering designs.[14] Thus,

---

[14] As we have noted, *supra* at n.5, the record does not contain any documents detailing the contract between BBII and the City. But even accounting for the possibility that the contract contained a "no-damage-for-delay" or similar clause, BBII would arguably have been entitled, under the *Spearin* Doctrine, to recover damages from the City for its reliance on the designs provided by the City, if those designs were in fact defective. *Dewey Jordan, Inc.*, *supra* 258 Md. at 499 (1970). In *Dewey Jordan, Inc.*, the Court of Appeals concluded, following an examination of *United States v. Spearin*, that it would not enforce the public owner's no-damage-for-delay clause, reasoning that "'[t]he defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors.'" *Id.* at 499 (quoting *Laburnum Constr. Corp. v. United States*, 325 F.2d 451,457 (1963)). In *Raymond Int'l, Inc. v. Baltimore County*, 45 Md. App. 247, 258 (1980), this Court declined to relieve the Government of responsibility for inaccurate representations contained in specifications provided by County's engineer, despite "extensive and direct exculpatory clauses intended to place the responsibility and risk of inaccurate information upon the contractor." (quoting *Maryland Dept. of Public Safety & Correctional Servs. v. PHP Healthcare Corp.*, 151 Md.

a government building contractor can normally recover costs from the government for its reliance on defective designs supplied by the government; whereas, a property owner or accounting client, for example, typically cannot recover their expectation-type damages from anyone other than the title examiner or accounting professional. *Compare Raymond*, 45 Md. App. at 257-58 (concluding that Baltimore County was liable to the general contractor for "materially wrong and substantially inaccurate" specifications provided to the general contractor by the project engineer retained by the County), *with Walpert*, *supra*, 361 Md. 645, 692-94 (concluding that an accountant may be held liable for negligence to a non-contractual party where the specific purpose of retaining the accountant was to rely on the financial reports created to determine whether to loan money to the business).

We conclude that Maryland decisional law countenances a distinction between the duty owed by design professionals to construction contractors under government contracts, and the duty owed by accountants and other professionals to third parties who can establish reliance and the elements of an intimate nexus. *See Jacques,* 307 Md. at 540; *Walpert,* 361 Md. at 674, 692. In the construction industry, parties can delimit their economic risk by defining their respective rights and liabilities contractually. We read our precedent,

---

App., 182, 202 (2003)). Notably, however, where delay damages are not caused by a contractor's reliance on the public owner's faulty plan specifications, the *Spearin* Doctrine does not apply and this Court has determined that "no-damage-for-delay" clauses are enforceable, even for delays not contemplated by the parties. *See State Highway Admin. v. Greiner Engineering Sciences, Inc.*, 83 Md. App. 621, 638-39 (1990) (enforcing a "no-damages-for-delay" clause in a state highway contract where the engineer suffered delay damages resulting from the SHA's numerous changes in the scope of the design work and funding uncertainties).

embracing the *Spearin* doctrine, to encourage, rather than discourage, design professionals and contractors to communicate with each other on public works projects where necessary in the interest of public safety. Especially in situations where the design professional is hired as a neutral agent of the owner, expanding Maryland law to permit exposure to tort liability for economic loss would create a chilling effect on the design professional's neutrality and ability to communicate effectively. We agree with the observations of the Supreme Court of Washington that

> [t]here is a beneficial effect to society when contractual agreements are enforced and expectancy interests are not frustrated. . . . The preservation of the contract represents the most efficient and fair manner in which to limit liability and govern economic expectations in the construction business.

*Berschauer/Phillips*, *supra*, 881 P.2d at 992-92. Accordingly, we hold that the "privity equivalent" concept of extra-contractual duty does not apply in an action for professional negligence against a design professional by a contractor seeking purely economic damages on a public construction project where there is no death, personal injury, property damage, or the risk of death or serious personal injury.

## II.

## Restatement (Second) Torts § 552

BBII also argues that the Restatement (Second) of Torts § 552 provides plaintiffs in Maryland with a cause of action for harm stemming from information negligently supplied for the guidance of others and that it was error for the circuit court to dismiss this claim presented in Count II of the complaint. BBII states that this tort is independent of its other two claims. RK&K maintains in response that Restatement § 552 has not been applied in

Maryland in cases involving architects, engineers, or contractors not in privity with the plaintiff.

Maryland courts have adopted the Restatement § 552 as an alternative means of satisfying the intimate nexus test. *Swinson*, *supra*, 360 Md. at 477; *see also Sanchez*, 213 Md. App. at 115 (citing *100 Inv. Ltd. P'ship*, *supra*, 430 Md. at 230).[15] In lieu of demonstrating the equivalent of contractual privity under the three-prong test developed in *Credit Alliance Corp.*, *supra*, a plaintiff can demonstrate a privity equivalent under

---

[15] The Restatement provides:

§ 552. Information Negligently Supplied for the Guidance of Others.

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement § 552. *Id*. However, for the same reasons that we declined to apply the "privity equivalent" analysis of the *Credit Alliance* and *Walpert* line of cases to satisfy the intimate nexus test, we also decline to apply the Restatement (Second) of Torts § 552 in this case.

In *Sanchez,* we examined the application of § 522 as an alternative to contractual privity in a case in which a physician, who provided life expectancy estimates to an insurance provider for viatical policies, was sued by investors for negligence in underestimating life expectancies. *Sanchez* 213 Md. App. at 97-100. There, we determined that § 552 was not a basis for imposing a tort duty on the physician. *Id*. at 118. We noted that the "undisputed evidence shows that Sanchez had no inkling of [the insurer's] actual role in the purchase of the viatical policies. . . . The mere possibility that [the insurer] might disclose the evaluation to others [the investors] is an insufficient basis to expand the scope of Sanchez's duty." *Id.*

BBII maintains that, because RK&K should have known that BBII was among the entities that would bid on the SC 852 contract with the City, § 552 permits recovery against RK&K "by the person or one of a limited group of persons for whose benefit and guidance [RK&K] intends to supply the information or knows that the recipient intends to supply it." Restatement § 552(2)(a). BBII underscores in its briefing that we also said in *Sanchez*, that "had [the insurer] told Sanchez that it was not purchasing viatical policies for its own benefit but was instead doing so as an agent for investors, Sanchez might owe a duty to those investors even if he did not know their specific identities." *Id.* Although this dicta lends some support to BBII's argument, it does not translate to the imposition of a tort duty

33

under these facts where there was no pre-determined set of bidders for the project. Moreover, this case involves two sophisticated businesses working on the same construction project. They each negotiated their independent contracts with the owner in what they understood was a "design-bid-build" construction project with the City of Baltimore. The relationship between BBII and RK&K—two veteran business entities in the construction field—is not at all similar to the relationship between the physician and the investors in *Sanchez*. The investors in *Sanchez* are more comparable to the client in *Jacques,* or the third-party investor in *Walpert*—parties who typically cannot recover their expectation-type damages from anyone other than the professional on whom they relied for advice. *See Jacques*, *supra*, 307 Md. at 540; *Walpert*, 361 Md. at 692-94.

But even if the Restatement § 552 analysis had application in the present context, BBII failed to allege facts sufficient to support this alternative intimate nexus equivalent. Under Restatement § 552(1), BBII must plead facts that establish RK&K provided *false information* and failed to exercise reasonable care or competence. The Court of Appeals explained in *Walpert*:

> For liability to attach under § 552, the plaintiff must be a member of a limited class to whom the accountant intends to supply the information or to whom the accountant knows the recipient intends to supply it, *who suffers loss through reliance on the information for substantially the same purpose as the bona fide client.*[16]

361 Md. at 677 (citation omitted) (emphasis supplied).

---

[16] The Court of Appeals ultimately decided not to apply Restatement § 552 in *Walpert*, 361 Md. at 681.

34

Here, the complaint states simply that "RK&K failed to exercise reasonable care and competence in preparing, supplying and communicating the design to [BBII] and in failing to timely design the 845R project so that it would not impact the completion of the [SC 852] Project." There is no allegation in the complaint that RK&K made a false statement other than the allegedly flawed designs, or that RK&K told BBII that the 845R project would be completed on a certain date. BBII does not allege any facts to demonstrate that RK&K did not exercise reasonable care or competence, other than making a conclusory statement that they did not. Therefore, we concluded that the utility of Restatement § 552 as an alternative means to establishing an intimate nexus is not applicable to this case, and even if it were, BBII failed to allege facts sufficient to meet the elements of § 552. We affirm the judgment of the circuit court.

### III. Negligent Misrepresentation

BBII presents another alternate theory for recovery in Count III, alleging that RK&K is liable under the tort of negligent misrepresentation. Relying on *Whiting-Turner*, *supra*, 308 Md. at 41, BBII asserts that Maryland has recognized a cause of action for negligent misrepresentation seeking only economic loss that does not require contractual privity. BBII argues that it specifically pled in its complaint the elements of negligent misrepresentation, including that "RK&K made a false statement; i.e., RKK's design was flawed" and that RK&K intended that its design be relied upon by a "distinct class of persons—prospective contractors bidding on the Project, including BBII."

RK&K relies on its general contention that, in Maryland, the economic loss doctrine bars design professionals in the construction field from liability for purely economic loss

35

suffered by a contractor, "in the absence of privity, death, injury or a risk of death or serious personal injury, or property damage. . . ." RK&K maintains that its position is supported by sound policy, citing to *LAN/STV*, *supra*, wherein the Supreme Court of Texas considered whether a contractor could recover for negligent misrepresentation against the project architect. 435 S.W.3d 234. The contractor alleged that, "[i]n the course of providing the referenced plans, drawings, and specifications, LAN/STV made representations, in a transaction for which it was compensated, where those representations were false, misleading and/or inaccurate and were made with the knowledge that contractors such as EBY would rely upon them." *Id.* at 237 n.10. The Supreme Court held that the contractor was barred from bringing a negligent misrepresentation claim by the economic loss rule because the construction industry has the "freedom to allocate economic risk through contract."

As stated in *Whiting-Turner*, "[t]he tort of negligent misrepresentation has been recognized in this State." 308 Md. at 41-2 (citing *Flaherty v. Weinberg*, 303 Md. 116, 135 (1985); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328 (1982)). In Maryland, common law negligent misrepresentation is comprised of the following elements:

> (1) The defendant, *owing a duty of care to the plaintiff,* negligently asserts a false statement;
> (2) The defendant intends that his statement will be acted upon by the plaintiff;
> (3) The defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) The plaintiff, justifiably, takes action in reliance on the statement; and
> (5) The plaintiff suffers damage proximately caused by the defendant's negligence.

36

*Flaherty*, 303 Md. at 135 (emphasis in *Flaherty*) (citing *Martens Chevrolet,* 292 Md. at 337); *see also Walpert*, 361 Md. at 656-57. To recover damages in a tort action for fraudulent misrepresentation, "a plaintiff must prove that a false representation was made, that its falsity was either known to the maker or that the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity, that the representation was made for the purpose of defrauding the plaintiff, that the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and that the plaintiff actually suffered damage directly resulting from the misrepresentation." *Swinson*, *supra*, 360 Md. at 476 (citing *Gittings v. Von Dorn,* 136 Md. 10, 15–16 (1920); *Martens Chevrolet*, 292 Md. at 333).

For claims of economic loss based on negligent misrepresentation, the injured party must demonstrate it had an "intimate nexus" relationship with the defendant in order to establish that the defendant owed a duty to the injured party. *See Jacques*, *supra*, 307 Md. at 534-35. In *Walpert*, the Court of Appeals determined that a duty could be imposed on accountants to a non-contractual plaintiff if the plaintiff could establish an intimate nexus through the privity equivalent test developed in *Credit Alliance.* 361 Md. at 681, 689-93; *see also Sanchez*, *supra*, 213 Md. App. at 107-109 (explaining that negligent misrepresentation's duty element requires satisfaction of the intimate nexus test as stated in *Walpert*).

The cases surveyed above and throughout this opinion make plain that the prerequisites for establishing the duty element are the same for negligent misrepresentation

37

and professional negligence claims in Maryland.[17]  Because, in this case, there was no contract between the parties, to impose a duty for negligent misrepresentation would require that we apply the "privity equivalent" test, or Restatement § 552, to determine whether there was an intimate nexus between the parties.  Just as we did with respect to BBII's claim of professional negligence, we reject the argument that extra-contractual concepts of duty permit the recovery of solely economic losses in the construction industry in a cause of action for negligent misrepresentation.[18]  The parties, both sophisticated

_____

[17] For example, in *Prudential Securities, Inc. v. E-Net, Inc.*, this Court considered whether a corporation and transfer agent had a duty in tort to a stock broker under theories of negligence and negligent misrepresentation.  140 Md. App. 194, 200-206 (2001).  First, this Court acknowledged that, to establish a duty in tort where the risk of loss is purely economic, the parties must share an intimate nexus, satisfied by contractual privity or its equivalent.  *Id.* at 213-14.  This Court then determined that the parties did not share a "meaningful link" to support a cause of action for negligence.  *Id.* at 221 (quoting *Jacques*, 307 Md. at 535).  Later in the opinion, in considering the appellant's negligent misrepresentation claim, this court acknowledged that negligent misrepresentation is "one variety of a negligence action."  *Id.* at 230 (quoting *Walpert*, 361 Md. at 654).  After setting out the elements of a negligent misrepresentation claim, however, this Court summarily dismissed the claim, explaining, "[a]s we discussed above . . . neither [appellees] owed a duty to [appellant] in this situation."  *Id.*; *see also Village of Cross Keys*, *supra*, 315 Md. at 752-755 (determining whether a duty in tort for purely economic loss existed *prior* to determining whether to treat the claim as one for negligent misrepresentation or one for negligent conduct).

[18]  We are not persuaded that BBII's contention that RK&K should have known BBII would be among the entities that would bid on the SC 852 contract establishes the kind of reliance required to sustain a cause of action for negligent misrepresentation.  In *Raymond*, *supra*, this court explained why it found no error in the trial court's granting of Greiner's motion to dismiss Raymond International's suit against Greiner on the grounds of misrepresentation at the conclusion of Raymond's case:

> It would serve no useful purpose to again restate the five prerequisites of proof required to sustain an action for misrepresentation or deceit. It is sufficient to state that the appellant failed to produce evidence from which could be found or inferred that Greiner intended to defraud by reason of the

38

businesses with experience in construction projects and contracts, were free to allocate their duties and risks in their contracts with the City. BBII's claims against RK&K for benefit-of-the-bargain economic damages under theories of professional negligence and negligent misrepresentation based on allegedly inaccurate timelines and flawed specifications that belonged to the City are barred by the economic loss doctrine.

For the foregoing reasons, we affirm the circuit court's dismissal of BBII's negligent misrepresentation claim.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**

---

allegedly incorrect information it furnished to Raymond. Even assuming that Greiner was negligent in preparing the information it furnished to the bidders, that would not be sufficient to satisfy the plaintiff's burden as a misrepresentation induced by negligence or ignorance will not sustain an action for fraud. . . . There was no testimony establishing clear and convincing evidence that Greiner's representations in this case were made for the specific purpose of defrauding the plaintiff. *This is particularly so when we note that at the time the information was supplied to the prospective bidders no one had any knowledge as to who the successful bidder would be*.

45 Md. App. 247, 261-62 (internal citations omitted) (emphasis supplied).